[No. 38826. En Banc. July 18, 1967.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT E. BOEHME, *Appellant*.*

*Reported in 430 P.2d 527.

622

*Frank August Peters,* for appellant.

*John G. McCutcheon, Schuyler J. Witt,* and *Edwin J. Wheeler,* for respondent.

HAMILTON, J.—Defendant, Robert E. Boehme, a medical doctor, was charged, tried before a jury, and convicted of the crime of assault in the first degree. He appeals. We affirm the conviction.

The offense involved arose out of a purported attempt on the part of defendant to poison his wife, Mary Boehme. The circumstances giving rise to the charge, as revealed by the evidence, lend themselves to the following summary.

At about 9:30 p.m., on June 29, 1965, defendant, Mrs. Boehme, and two other members of the family went to the family boathouse to work on their boat. During the course of the evening, and while defendant and Mrs. Boehme were working at the bow of the boat, a board or heavy plank fell and struck Mrs. Boehme about the head. She was stunned or briefly rendered unconscious and fell to the floor. Upon regaining her senses, she complained of pain, and defendant administered to her by injecting a substance into her hip. Defendant then, with the aid of two members of the family, carried Mrs. Boehme to the family automobile and transported her to a local hospital, the Harrison Memorial Hospital in Bremerton, Washington, and summoned Dr. Benjamin T. Strehlow, a general practitioner, who had treated her previously. After arrival at the hospital, and before Dr. Strehlow appeared, defendant removed Mrs. Boehme's contact lenses from her eyes. Defendant testified that during this procedure he inadvertently and unintentionally utilized a type of eye drops (isopto atropine) which would cause the pupils of her eyes to dilate.

When Dr. Strehlow reached the hospital he was informed by defendant that Mrs. Boehme had suffered a severe blow on the head, although the only surface manifestation thereof was a slight abrasion in the area of the neck. The doctor was not advised of any medication Mrs. Boehme might have taken during the day, nor of the earlier injection, and of the application of any eye drops. His examination of Mrs. Boehme revealed that the pupils of her eyes were widely dilated and that she was drifting in and out of a coma. The doctor thereupon ordered skull X rays and performed a spinal tap. The X rays were negative as to bone damage; however, the spinal tap indicated a bloody discoloration of and pressure on the spinal fluid. Dr. Strehlow then concluded that Mrs. Boehme was in urgent need of the services of a neurologist and with defendant's participation arrangements were made to transport her by ambulance to St. Joseph's Hospital in Tacoma, for the attention of Dr. Stanley Durkin, a neurologist and neurosurgeon.

The ambulance with Mrs. Boehme, the driver, one attendant, and the defendant reached St. Joseph's Hospital at about 1:30 a.m., June 30, 1965. The ambulance was met by Dr. Durkin. The defendant delivered samples of the spinal fluid removed by Dr. Strehlow and informed Dr. Durkin that Mrs. Boehme had been struck on the head. Again, the defendant neglected or forgot to advise the doctor of any earlier medications. Finding no superficial evidence of a blow to the head, except the neck contusion, Dr. Durkin ordered immediate skull X rays. Again the X rays were essentially negative as to skull damage; however, the doctor's physical examination, conducted while Mrs. Boehme was on the X-ray table, revealed that she was then in a deep semicomatose condition, that the pupils of both eyes were widely dilated and fixed, that her abdomen was hard and rigid, that her body muscles were spontaneously twitching and jumping, that deep tendon reflexes were absent, and that respiration was irregular. Proceeding upon a working diagnosis of brain injury, Dr. Durkin placed her in a hospital room under constant observation. Shortly after

Mrs. Boehme arrived at her hospital room, and between 2:30 a.m. and 3:15 a.m., extreme respiratory difficulty developed. Artificial respiration, oxygen, and a Byrd respirator, an automatic breathing machine, were applied, the latter by the use of a face mask. Although these steps alleviated the immediate respiratory failure, her condition despite intermediate adjustments of the respirator did not measurably improve and by 8 a.m. her condition was diagnosed as terminal. At this point the Byrd respirator was turned on the fully controlled breathing cycle and connected to a tracheal tube leading directly into her windpipe. A second spinal tap was also made and again revealed discoloration of and pressure on the spinal fluid. The defendant was advised that her condition was very critical. Having patients of his own to care for, the defendant returned to his office.

During the course of the day, Mrs. Boehme rallied. Various of her symptoms diminished and her respiration improved to the point where she could breathe without the aid of the automatic respirator. She was placed upon an intravenous solution of glucose and water and, by early evening, her vital signs were such as to permit removal of the tracheal tube and coherent conversation. Dr. Durkin advised defendant he felt she was on the road to recovery.

At about 9 p.m., after Dr. Durkin had visited Mrs. Boehme and found her condition continuing to improve, the special nurse left her in the temporary charge of a student nurse. Shortly thereafter, defendant visited his wife and asked the attending nurse to leave the room. The student nurse complied, but returned to the room in a few minutes at which time she observed defendant move his hand from the area of Mrs. Boehme's hip to his pocket. Again the defendant requested the nurse leave him alone with his wife, and again the nurse complied. On this occasion, however, the nurse reported the circumstances of her absence to the floor nurse who immediately entered Mrs. Boehme's room. At about this time, the defendant departed. The floor nurse, in company with the student nurse and the special

nurse, then observed a fresh hypodermic injection site on Mrs. Boehme's hip. The nurses also noted that Mrs. Boehme was having difficulty in breathing. Dr. Howard Pratt, the anesthesiologist, who had previously removed the tracheal tube for the Byrd respirator, and an intern, a Dr. Kazi, were summoned and upon arrival found Mrs. Boehme in extreme straits. Her earlier symptoms had returned, her respiration was of the terminal type, and the doctors conceived that she was dying. Emergency measures were initiated, the trachea tube was reinstalled and the Byrd respirator reactivated. Dr. Durkin arrived and after consultation with Dr. Pratt and other doctors on the scene it was concluded that her condition was induced or caused by poisoning through the medium of some rare drug. This conclusion was reached upon the basis of the hypodermic injection sites on her hip and because some of her symptoms could not be reconciled with any but the gravest of brain injuries. Blood and urine samples were then taken, the intravenous bottle was detached, and all were sealed, marked for identification, and placed under refrigeration for subsequent analysis.

During the early morning hours of July 1, 1965, Mrs. Boehme again rallied dramatically. From that time forward she improved steadily and was ready for release from the hospital on July 15, 1965.

During the interval between July 1 and July 15, 1965, additional blood samples were taken, marked for identification, and refrigerated. These samples, together with the earlier blood samples were sequentially prepared for analysis[1] and, with a similarly prepared sample of normal blood and the urine specimens, were forwarded to the office of the chief medical examiner of the state of Maryland for the attention of and analysis by Dr. Charles S. Petty, a patholo-

---

[1]The preparation referred to was accomplished by separating, through a centrifuging process, the respective blood samples into plasma and red blood cell components. The samples of the respective components were in turn marked for identification as units of the original samples.

gist and assistant medical examiner, and Dr. Henry C. Freimuth, a toxicologist in the chief medical examiner's office.

The intravenous (I.V.) bottle, detached and removed on the night of June 30, 1965, sealed with distinctively marked tape, remained in the refrigerator of the hospital medicine room until July 20, 1965. At that time it was removed by a nurse, who testified as to its markings and seal, and delivered to a police officer. The police officer in turn delivered it to Dr. Charles P. Larson, a Tacoma pathologist, who had been called to St. Joseph's Hospital for consultation on the night of June 30, 1965. Dr. Larson examined the markings and seal, locked the bottle in his evidence locker, and on January 19, 1966, delivered it for analysis to Dr. David A. Eagleson, a toxicologist and analytical chemist at the Tacoma General Hospital, who had also been present at the events occurring during the late night and early morning of June 30 and July 1, 1965, respectively, at St. Joseph's Hospital.

Dr. Eagleson testified that his analysis of the fluid in the intravenous bottle, a unit normally sealed with its contents by the manufacturer, although otherwise designed to receive injections of substances supplementary to its original contents, revealed approximately 1.39 milligrams of promazine per 50 cc's of fluid in the bottle. Promazine, otherwise known as sparine, was identified during the trial as a potent tranquilizing drug. Dr. Eagleson testified such a drug was not produced by the manufacturer of the intravenous bottle and its contents.

Dr. Freimuth, the Maryland toxicologist, testified his analysis of the first urine specimen, covering the period from 9:45 p.m., June 30, 1965, to 2 a.m., July 1, 1965, revealed a concentration of free promazine in the quantity of 1 milligram per 100 cc's of fluid, in addition to breakdown products of promazine. He stated that his analysis of the second urine sample, covering the period from 12 o'clock noon to 2:30 p.m., July 2, 1965, indicated no free promazine, but did reveal breakdown products of the drug.

He detected no other pertinent toxic substances in the urine samples.

Dr. Petty, the assistant medical examiner of Maryland, testified that comparison tests of the various blood samples were conducted under his supervision and control. He stated that such tests revealed the presence of an anti-cholinesterase agent in Mrs. Boehme's system on the night of June 30, 1965. This agent, he opined, was a drug of the carbamate class. Cholinesterase was described by the evidence as an enzyme, present throughout body tissues, which performs the function of transmitting brain impulses from the nerve circuits to the muscles. The introduction into the body of an anti-cholinesterase agent, under the evidence, thus would have the effect of impeding or arresting the conduction of vital and essential impulses from the brain to the muscular system. Dr. Petty further testified that the tests indicated a significant reduction in Mrs. Boehme's cholinesterase level on the night of June 30th, that brain injury would not cause such a diminishment and that the introduction of promazine into the system would accelerate the effects of any anti-cholinesterase agent then present in Mrs. Boehme's body.

The evidence introduced in support of a motive for the offense charged to the defendant, indicated that Mrs. Boehme was heavily insured and that the defendant was involved in an extramarital affair.

In response to the evidence adduced by the state, the defendant denied any action, effort or wish on his part to poison his wife. He presented testimony to the effect that Mrs. Boehme was emotionally unsettled; that the tranquilizing drug promazine (sparine) had been prescribed to alleviate her condition; that events occurring during the day of June 29, 1965, unduly disturbed her; that she took an unusually heavy dosage of her tranquilizing drug on June 29th (upwards of 1500 milligrams), a fact which defendant did not discover until the late afternoon of June 30th; that such an overdose would account for the free promazine and the by-products thereof in the urine

samples; that immediately following the blow to Mrs. Boehme's head in the boathouse on June 29th, defendant administered a hip injection of 1/6th of a grain of morphine to relieve her pain; that the introduction of eye drops with dilating propensities at the hospital in Bremerton was inadvertent and not immediately known to defendant; that when defendant visited his wife in the hospital on the evening of June 30th he asked to be alone with her so that they could pray together; that while alone with her defendant administered a hip injection of 20 milligrams of the drug ritalin, a mild stimulant, to offset the effects of her overdosage of promazine; that although defendant then examined the intravenous bottle he did not put anything into it; that any evidence of promazine in the fluid in the intravenous bottle was explicable only on the basis that it was not adequately guarded between the time of its removal on June 30, 1965, and analysis in January, 1966; that defendant visited his wife around 7 a.m., July 1, 1965, and found her well on the road to recovery, which confirmed his belief that the ritalin he had administered the night before had neutralized the overdose of promazine; that defendant's failure to fully advise the attending physician of the overdose of promazine, the morphine injection, the eye drops, and the ritalin injection was due to oversight, inability to communicate with the doctor, or the unwise choice of alternatives rather than a deliberate act; that Mrs. Boehme's symptoms and the course of her recovery were consistent with and due to a head injury and the other factors involved rather than the result of any type of poisoning by defendant; that defendant was not in need of money and, although he initially denied and then admitted an affair, the extramarital relationship with another woman was misguided and of no significance; and that defendant and Mrs. Boehme mutually loved, trusted, and respected one another at all times concerned.

In contradiction to the testimony relating to the presence of an anti-cholinesterase agent in any of the blood samples, the defendant presented the testimony of Dr.

Charles H. Hine, a physician, toxicologist, and professor of toxicology employed by the University of California and associated with the San Francisco city and county coroner's department. Dr. Hine, in essence, questioned the sufficiency, accuracy, reliability, significance, and credibility of the conclusions drawn and presented by Dr. Petty in relation to the blood tests conducted under Dr. Petty's supervision. Dr. Hine's primary predicates in this respect were the length of time elapsing between the drawing of the blood and its processing, the limited number of samples tested, the differences between cholinesterase enzymes found in plasma and red blood cells, the lability of carbamate drugs in relation to cholinesterase enzymes, the variations in cholinesterase levels between individuals, as affected by different causes, the exactness required in testing, and the susceptibility of laboratory testing techniques to error. In short, Dr. Hine indicated that Dr. Petty's tests and conclusions were not worthy of any significant weight. He did not, however, directly attack the method or manner of testing employed by Dr. Petty.

Dr. Hine also assailed the significance of Dr. Freimuth's findings of promazine and the by-products thereof in the urine samples. This he did upon the basis that the quantities of promazine reportedly found in the urine samples betokened, at best, only a nonpoisonous and otherwise harmless intake of the drug. Dr. Hine further testified that in his opinion Mrs. Boehme's symptoms and course of recovery indicated a head injury rather than any bizarre type of poisoning.

Finally, Mrs. Boehme testified to the effect that she did not believe the defendant attempted to poison or harm her in any way and that she loved and trusted him and expected to continue to live with him as his wife.

Confronted with the foregoing circumstances and testimony, the jury found defendant guilty as charged.

On appeal, defendant makes 26 assignments of error. By way of argument in support of his assignments, defendant groups them into 8 categories. For convenience of discus-

sion, we reduce the categories to 5. Our consideration will therefore revolve about claims of error directed to rulings of the trial court relative to (1) pretrial discovery; (2) physician-patient privilege; (3) admission of certain exhibits; (4) admission of certain medical testimony; and (5) procedural matters.

### PRETRIAL DISCOVERY

In this category defendant directs his attention to the trial court's order denying his motion to require the state to furnish him copies of medical reports and the results of blood and urine tests.

The following resume is the pleading background to the pertinent order of the trial court. The information charging defendant with the offense involved was filed September 20, 1965. Arraignment followed on September 21, at which time defendant interposed a motion to make the information more definite and certain or, in the alternative, to require the state to answer specified interrogatories bearing upon the nature of the poison allegedly used and the manner and nature of its administration. The state was directed to answer the interrogatories in basic part, which it did by stating that the poison involved was an anticholinesterase agent and/or promazine administered in the hip of Mrs. Boehme at St. Joseph's Hospital. The defendant then pleaded not guilty and bail was fixed and posted. On or about October 1, 1965, the state served defendant with its list of witnesses, and, on October 11, 1965, defendant filed and served his motion for production of reports and statements. The motion was couched in all inclusive terms requesting copies of "all written reports received from any doctor, professional, or expert person . . . including reports and discussions of tests performed upon the blood, tissues, parts, fluids, or products of the body of said Mary Boehme." Furthermore, the motion sought divulgence of any oral reports, as well as all laboratory reports regarding pertinent blood, fluid, or tissue tests. The motion came on for hearing and on October 21, 1965, the trial court entered its order providing as follows:

IT IS HEREBY ORDERED that the plaintiff State of Washington shall state with particularity the disposition of any blood samples, tissues, parts, fluids or products of the body of Mary Boehme drawn or taken from her on or after the 29th day of June, 1965.

IT IS FURTHER ORDERED that it appearing that the defendant has not made a sufficient showing *at this time* that the other material sought by the motion is not available to him by other means, that all of the rest of the defendant's motion is denied. (Italics ours.)

At or about this time Mrs. Boehme, acting through defendant's counsel, in separate civil proceedings, sought and obtained orders from another department of the Superior Court for Pierce County restraining Dr. Durkin and the custodian of the records of St. Joseph's Hospital from divulging or releasing pertinent medical information and documents, and the prosecuting attorney from conferring with certain other medical witnesses. These orders were predicated upon the ground of a claim of the physician-patient privilege by Mrs. Boehme. Following these orders, it appears that various of the medical witnesses listed or expected to be called as witnesses by the state were advised by letter from counsel that Mrs. Boehme intended to claim the full benefit of her privilege as to any confidential information they might possess or divulge. From and after the trial court's order of October 21, and the civil proceedings, it does not appear from the record that defendant renewed his motion for the production of any documents, reports, or laboratory tests in the possession of the prosecution before the trial commenced on January 24, 1966.

At this point, we momentarily pause to observe that the rules of discovery are designed to enhance the search for truth in both civil and criminal litigation. And, except where the exchange of information is not otherwise clearly impeded by constitutional limitations or statutory inhibitions, the route of discovery should ordinarily be considered somewhat in the nature of a 2-way street, with the trial court regulating traffic over the rough areas in a manner which will insure a fair trial to all concerned, neither

according to one party an unfair advantage nor placing the other at a disadvantage. *State v. Robinson,* 61 Wn.2d 107, 377 P.2d 248 (1962); *State v. Gilman,* 63 Wn.2d 7, 385 P.2d 369 (1963); *State v. Peele,* 67 Wn.2d 893, 410 P.2d 599 (1966).

 In view of all of the circumstances appearing including the fact that the trial court's order contained an inherent invitation to defendant to renew his motion and present a more adequate showing of necessity, we are convinced this claim of error falls squarely within the ambit of our holding in *State v. Mesaros,* 62 Wn.2d 579, 384 P.2d 372 (1963), wherein we said at 587:

> There appears to be a growing tendency, not only in this state, but in other jurisdictions as well, to liberalize the right of a defendant to discovery in criminal cases. See *Powell v. Superior Court,* 48 Cal. (2d) 704, 312 P. (2d) 698 (1957), and *Walker v. Superior Court,* 155 Cal. App. (2d) 134, 317 P. (2d) 130 (1957). The *Thompson* case [*State v. Thompson,* 54 Wn.2d 100, 338 P.2d 319 (1959)] would appear to follow the same philosophy and reasoning, but it must be remembered that all of these cases are based upon the same fundamental rule that the granting or denial of a defendant's motion for discovery rests within the discretion of the trial court and will not be disturbed in the absence of a manifest abuse of discretion.

> In the instant case, the court granted a portion of appellant's motion for inspection and reserved the right to him to renew this motion on a further showing of necessity. Although he prepared an additional motion, he failed to present it to the court. In other words, the court opened the door to him, but he failed to enter. There is no way that this court or anyone else can now discover what the court's ruling might have been, had this motion been further urged and proper showing made in support of it. The court was not given an opportunity to exercise its discretion, although the record indicates a liberal and fair attitude. Under the circumstances of this case, we find no error in the court's failure to grant further discovery.

> We so hold in this case.

PHYSICIAN-PATIENT PRIVILEGE

As indicated in our discussion under the preceding category, it became apparent early in the course of this case that Mrs. Boehme intended to claim the physician-patient privilege as to information gained by the physicians and hospital personnel who attended her between June 29 and July 16, 1965. This she did through defendant's counsel acting on her behalf, both by way of civil actions seeking to restrain their testimony as well as asserting the privilege at defendant's trial.

The trial court denied Mrs. Boehme's claim of privilege and overruled defendant's objections to the pertinent testimony. Defendant assigns error, contending that the trial court's action abrogates the privilege and/or constitutes an invasion of Mrs. Boehme's constitutional right of privacy.

We cannot agree with defendant.

■ At common law, no testimonial privilege existed between patient and physician as to communications or information passing between them. The privilege, as we accept it today is the creature of statute, and as such is a procedural safeguard rather than a rule of substantive or constitutional law. The applicability, therefore, of the privilege in a given situation turns upon the language and interpretation of the pertinent statutory provisions.

In this state, the significant statutory provisions are RCW 5.60.060(4), 10.58.010, and 10.52.020, which respectively provide:

> A regular physician or surgeon shall not, without the consent of his patient, be examined in a civil action as to any information acquired in attending such patient, which was necessary to enable him to prescribe or act for the patient, but this exception shall not apply in any judicial proceeding regarding a child's injuries, neglect or sexual abuse, or the cause thereof. RCW 5.60.060(4).

> The rules of evidence in civil actions, *so far as practicable,* shall be applied to criminal prosecutions. (Italics ours.) RCW 10.58.010.

> Witnesses competent to testify in civil cases shall be competent in criminal prosecutions, but regular physicians or surgeons, clergymen or priests, shall be pro-

tected from testifying as to confessions, or information received from any defendant, by virtue of their profession and character; . . . . RCW 10.52.020.

The judicially proclaimed purpose of statutes such as ours, establishing the privilege, is to surround communications between patient and physician with the cloak of confidence, and thus allow complete freedom in the exchange of information between them to the end that the patient's ailments may be properly treated. *State v. Miller*, 105 Wash. 475, 178 Pac. 459 (1919).

In the last cited case *(State v. Miller, supra)*, we construed the foregoing statutes to mean that the privilege provided by RCW 5.60.060(4) was, by virtue of RCW 10.58.010, extended to criminal prosecutions, in the sense that a defendant, standing charged with a crime, could claim and assert the privilege as to the testimonial knowledge of a physician acquired in the course of professionally treating such defendant. Despite the fact that our sister states of California,[2] Oregon,[3] Idaho,[4] Montana,[5] and Utah[6] have otherwise applied analogous statutory provisions, we have steadfastly adhered to our ruling in the *Miller* case. *State v. Sullivan*, 60 Wn.2d 214, 373 P.2d 474 (1962); *State v. McCoy*, 70 Wn.2d 964, 425 P.2d 874 (1967).

We have, however, refused to permit an accused person to claim the privilege arising between an *examining* physician and the victim of the accused person's crime. *State v. Winnett*, 48 Wash. 93, 92 Pac. 904 (1907); *State v. Thomas*, 1 Wn.2d 298, 95 P.2d 1036 (1939); *State v. Fackrell*, 44 Wn.2d 874, 271 P.2d 679 (1954). Although none of these cases dealt directly with the right of an accused to claim the privilege arising between the victim and his or her *treating* physician, we did note in the *Fackrell* case, at 878, that

---

[2] *People v. Gonzales*, 182 Cal. App. 2d 276, 5 Cal. Rptr. 920 (1960).

[3] *State v. Betts*, 235 Ore. 127, 384 P.2d 198 (1963).

[4] *State v. Bounds*, 74 Idaho 136, 258 P.2d 751 (1953); *State v. Coburn*, 82 Idaho 437, 354 P.2d 751 (1960).

[5] *State v. Campbell*, 146 Mont. 251, 405 P.2d 978 (1965).

[6] *State v. Dean*, 69 Utah 268, 254 Pac. 142 (1927).

The former decisions of this court fit into the rationale of the majority rule set forth by R. P. Davis in an annotation entitled "Right of one against whom testimony is offered to invoke privilege of communication between others," appearing in 2 A. L. R. (2d) at 647, wherein it is said:

"The weight of authority supports the view that the doctrine of privileged communications as between physician and patient, usually incorporated in statutory enactments, is intended for the benefit of the patient, and that the defendant in a criminal prosecution has no right to object to the testimony of a physician concerning communications made by the victim of the crime to such physician, or information gained from the victim by the physician, in his professional capacity."

We find no reason asserted in our cases, in our application of our statutory provisions, or in the statutory provisions themselves which would require a departure or a deviation from the majority rule recognized and cited in the *Fackrell* case.

Accordingly, we hold that the defendant could not assert the doctor-patient privilege flowing to Mrs. Boehme as the patient and asserted victim of the alleged crime.

This, then, leaves the question of the efficacy of Mrs. Boehme's claim, as patient-victim, of the privilege.

■ In this respect, it is generally recognized and accepted that the privilege is essentially one intended for the benefit of the patient, and is one personal to the patient. *State v. McCoy, supra.* This approach is in keeping with the underlying purpose of the privilege, that is, to facilitate and safeguard a free exchange of information in the course of treatment. A further purpose has also been occasionally noted—that of protecting the patient from embarrassment, scandal, or incrimination which might flow from the revelation of intimate details connected with the medical treatment of physical ills. These purposes are benevolent and wholesome. They fully warrant and justify the privilege in appropriate cases.

The privilege, however, should be fairly limited to its purposes. Absent the most cogent of reasons, it should not,

by unrealistic or impractical application, become a means whereby criminal activities of third persons may be shielded from detection, prosecution, and punishment, however magnanimous, compassionate or conciliatory the victim might otherwise wish to be. To allow the privilege to thus become a device by which the victim of an attempted crime could, without a civically paramount reason, thwart the course of a criminal proceeding against the perpetrator might well promote greater evils than the privilege was designed to avoid. The maintenance of an orderly society, and the circumvention of criminal activities, are functions of government which should not be subject to casual suppression by the operation of a procedural rule primarily designed for the purpose of aiding in the healing of physical ailments. Cf. *People v. Lay*, 254 App. Div. 372, 5 N.Y.S.2d 325 (1938), *aff'd* 279 N.Y. 737, 18 N.E.2d 686 (1939); *Wimberley v. State*, 217 Ark. 130, 228, S.W.2d 991 (1950); *State v. Antill*, 176 Ohio. St. 61, 197 N.E.2d 548 (1964).

In the instant case, we can conceive of little additional embarrassment or humiliation visited upon Mrs. Boehme by virtue of admission of the challenged evidence than that occasioned by the bringing of the charges in the first instance. Likewise, the testimony of the treating physicians and/or hospital personnel by no manner of means subjected her to any form of criminal liability. Moreover, we cannot visualize any significant public interest which would be served by foreclosing a full judicial investigation of the charges here preferred.

Bearing in mind that the legislature, by RCW 10.58.010, in effect, attached a condition of practicality to the application of the physician-patient privilege in criminal prosecutions, we conclude that the trial court did not err in overruling Mrs. Boehme's claim of the privilege under the circumstances prevailing in the instant case.

### ADMISSION OF CERTAIN EXHIBITS

By his assignments of error falling in this category, defendant challenges the admission into evidence of the blood

and urine samples and the intravenous bottle with its contents. In this vein, he argues that the state failed to sufficiently establish the identity of the exhibits, the chain of custody through which they passed, and the freedom from possible contamination. ·

We find no reversible error within the framework of defendant's contentions.

█ The applicable rule, distilled from a pertinent annotation in 21 A.L.R.2d 1216 (1952) and later cases, is succinctly summarized in 29 Am. Jur. 2d *Evidence* § 775 (1967) at 845:

> When objects, such as bullets, specimens, or parts taken from a human body, are produced in court and used there as an exhibit or made the basis for the testimony or report of an expert or officer, the identity of the object produced with the object taken from the body must be proved. Proof of this identity involves showing that the thing was taken from the particular body from which it was supposed to be taken, and that thereafter it was properly kept and, if necessary, transported and delivered to the one who produced it at the trial or the expert who analyzed or examined it.

Our review of the evidence presented satisfies us that the state fully complied with the requirements of the rule. Without detailing the testimony, it is sufficient to say that the state, through the testimony of the participating hospital, medical, and law enforcement personnel, methodically traced the identity, markings, custody, storage, preparation, and transportation of the respective samples and specimens from Mrs. Boehme's body and hospital room to the hands of the analyst. Time factors, and the potential effect thereof upon ultimate analysis, were fully explored and explained by the competing experts. And, beyond mere speculation and innuendo, there is not the least indication in the evidence that the questioned exhibits were anything other than what they were represented to be or that they were contaminated in the course of their journey to the testing laboratory.

The trial court did not err in admitting them into evidence. The weight to be accorded to the exhibits was for the jury.

## ADMISSION OF CERTAIN MEDICAL TESTIMONY

Defendant, by his assignments of error in this category, focuses attention upon the results of the chemical tests performed on the blood samples, as related by Dr. Petty, the Maryland pathologist.

■ In this regard, the testimony essentially reveals that after the respective samples came into his possession Dr. Petty and his assistant, a graduate chemist, working together in their laboratory facility, prepared the samples for analysis by the titrimetic or titration method. Thereafter, Dr. Petty's assistant took the prepared samples to a second laboratory, which, by the terms of a contract existing over a number of years, made available an automatic titrating machine for Dr. Petty's use. At this point, Dr. Petty's assistant placed or participated in placing the samples in the machine, observed the operation of the machine, recorded the outcome, and returned with the information to Dr. Petty's laboratory. There, Dr. Petty and his assistant correlated and compared the data with data from control samples, evaluated the analysis and determined the final results of the tests. Dr. Petty testified that his assistant was subject to his direction and that the process of analysis was under his supervision and control. Although defendant's expert, Dr. Hine, stressed the need for accuracy, he did not directly criticize the procedure or method of testing employed by Dr. Petty.

Defendant's assignments of error arise out of the fact that Dr. Petty's assistant was not called as a witness and Dr. Petty did not personally observe the operation of the automatic titration machine. The epitome of the contentions is concisely expressed in the following excerpt from defense counsel's objection to the challenged testimony during trial:

> In fairness to the witness, I believe he stated the tests were performed under his supervision, and the issue that

I was making is that supervision is not sufficient unless it includes observation, . . . .

We were confronted with a similar challenge in the case of *State v. Rutherford,* 66 Wn.2d 851, 405 P.2d 719 (1965). After analogizing the situation there presented to the Uniform Business Records As Evidence Act, RCW 5.45.020, and the underlying purposes of that act, we discussed and distinguished the principal cases relied upon by defendant (*State v. Baker,* 56 Wn.2d 846, 355 P.2d 806 (1960) and *Seattle v. Bryan,* 53 Wn.2d 321, 333 P.2d 680 (1958)) and stated at 855:

> We conclude that the trial court did not abuse its discretion in permitting the witness to give the results of tests performed under his supervision and control, even though he did not personally conduct the tests or witness their performance.

Although we cannot, under the circumstances of this case, applaud or commend the state's failure to call Dr. Petty's assistant as a witness, we are not persuaded that the trial court committed reversible error in admitting Dr. Petty's testimony.

### PROCEDURAL MATTERS

The errors assigned by defendant in this category are directed to (a) a trial amendment of the information, (b) the giving of instructions embracing the matter contained in the trial amendment, (c) defendant's challenges to the sufficiency of the evidence, (d) newly discovered evidence bearing upon the credibility of a witness, (e) evidence suggesting prejudice on the part of a juror, and (f) the publicity attendant upon the charges and the trial. Defendant contends the claimed errors individually and/or cumulatively deprived him of due process of law and a fair trial.

It would unduly prolong this opinion to discuss each claim of error in detail. Suffice it to say we have carefully reviewed and evaluated the various assignments standing alone and in the aggregate and are not persuaded that any reversible error flows therefrom. Defendant was

competently, intelligently, and energetically represented at all stages of the proceeding. The character, nature, and extent of the evidence presented in his defense reflects ample pretrial information and preparation. All significant procedural and technical issues presented were countered. The publicity attendant upon the case cannot be equated with that found in *Sheppard v. Maxwell*, 384 U.S. 333, 16 L. Ed. 2d 600, 86 Sup. Ct. 1507 (1966). Post trial matters were carefully considered and weighed by the trial court and we find no basis warranting the substitution of our judgment in these matters for that of the trial court. The evidence presented by the state, if believed by the jury, was ample to sustain the verdict.

We conclude that defendant received a fair trial and was accorded due process of law.

The judgment is affirmed.

FINLEY, C. J., HILL, DONWORTH, WEAVER, ROSELLINI, and HUNTER, JJ., and BARNETT, J. Pro Tem., concur.

December 8, 1967. Petition for rehearing denied.

*Reported in 430 P.2d 539.