IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                Appellant,<br><br>       v.<br><br>MARCO ALONZO CABRERA,<br><br>                Respondent. | No. 87267-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — The State of Washington appeals from the dismissal with prejudice of its prosecution of Marco Cabrera as the only appropriate remedy for a discovery violation by the trial prosecutor that resulted in prejudice to Cabrera's right to a fair trial. Because the trial court did not abuse its discretion in so ruling, we affirm.

FACTS

In early 2023, V[1] reported to the Kelso Police Department (KPD) that her employer, Marco Cabrera, had engaged in, among other things, multiple instances of sexual misconduct toward her while she was employed as a cleaner in his company. She described one incident on December 3, 2022, while she and Cabrera were completing a government building cleaning contract, and another on January 23, 2023, while they were both cleaning a local library when it was closed to the public. She reported that she fled from him and ran from the scene in

_____
[1] In the interest of privacy, we refer to the complaining witness by her first initial.

response to his misconduct on both occasions. There were no other eyewitnesses for either of these reported incidents.

The State charged Cabrera in Cowlitz County Superior Court with one count each of attempted rape in the second degree by forcible compulsion, indecent liberties by forcible compulsion, and unlawful imprisonment for his alleged conduct against V on December 3, 2022. The State also charged him with one count of indecent liberties by forcible compulsion and two counts of assault in the fourth degree with sexual motivation for his alleged conduct against her on January 23, 2023, and one additional count of assault in the fourth degree with sexual motivation alleged to have occurred between May 1 and September 1, 2022.

Shortly thereafter, KPD Detective Erik Swenningson drafted a police report stating that in early February 2023 he visited a retail store connected to the shopping mall wherein the library is located. His report indicated that an employee of the store "provided [him] with a DVD of the video footage from the store surveillance system as they have one camera which looks in the direction of the rear of the library. [He] logged the DVD into evidence after watching it briefly to confirm both [V] and [Cabrera] arrived at the library at the same time on 01-23-23." His report did not identify the total duration of the footage or whether it depicted anything more than V and Cabrera's arrival.

The next month, Cabrera's defense counsel filed a notice of appearance in the case along with a general demand for discovery, including specific demands for copies of any video surveillance of Cabrera and any exculpatory information

possessed by the State that would tend to negate Cabrera's guilt as to the charged offenses.

In response, the assigned deputy prosecuting attorney (DPA) provided certain discovery to Cabrera but did not include a copy of the recording of the library surveillance camera footage that was obtained by Swenningson and transferred to the State. Five months later, the prosecutor who had been initially assigned to the case was replaced by another DPA. In early 2024, the newly assigned DPA indicated that he had provided Cabrera with all of the State's discovery, which included a copy of Swenningson's report but not a copy of the library surveillance camera footage.

Additionally, during the early stages of the discovery proceedings, Cabrera's defense counsel hired a private investigator who visited the retail store adjacent to the library in an attempt to obtain its surveillance footage from January 23, 2023. The defense investigator was told that the footage no longer existed.

In March 2024, the State filed a first amended information that modified the charges based on V's report of additional instances of sexual and other misconduct by Cabrera against her between August and September 2022, four to five months prior to the December 2022 and January 2023 incidents. There were no other eyewitnesses for these alleged instances either.

A few weeks later, Cabrera's trial counsel interviewed V. V stated, in relevant part, that immediately after Cabrera's alleged sexual misconduct at the library in January 2023, she ran away from him. She then added that after she fled, he followed her, she confronted him, they discussed what happened, and she

"went on to say her [sic] and Mr. Cabrera went around the mall and eventually left the mall and went to their vehicles."

Trial in this matter was scheduled to begin on July 24, 2024. On July 16, both parties represented to the trial court that they were ready to go to trial. Two days later, on July 18, the State indicated that it was intending to call V as a witness. Cabrera indicated that his defense at trial was general denial. By the morning of July 23, the day before trial, the DPA reiterated to Cabrera's defense counsel that the State had complied with its discovery obligations.

Trial commenced on July 24, and the parties presented their opening statements to the jury. During the State's opening statement, the DPA repeatedly emphasized that the evidence in the case would show that V fled from Cabrera after each of the alleged incidents of his sexual misconduct. With regard to the alleged incident at the library, the prosecutor told the jury that when Cabrera first approached her, "she [ran] out of there," then she "[ran] over to the break room" before he caught up with her, and, after he eventually let her go, "she made her way out of the building."

During Cabrera's opening statement, his defense counsel told the jury that the evidence at trial would show that the allegations against Cabrera were almost exclusively based on V's testimony and she had provided inconsistent statements over the course of the proceedings. Additionally, in emphasizing the State's lack of evidence in the case, Cabrera's counsel stated to the jury, "Now, here's what you're not going to see in the case. *You're not going to see any evidence of video*

*footage*, despite the existence of security cameras everywhere. You're not going to see that." (Emphasis added.)

The State's case in chief began shortly thereafter, and the DPA indicated that the State planned to call V to testify the next morning. Later that evening, in preparing for V's cross-examination, Cabrera's defense counsel reviewed Swenningson's report and realized that the State had not provided the library surveillance camera footage to him in discovery. He immediately e-mailed the prosecutor to confirm whether it had been provided.[2]

The next day, on July 25, roughly an hour and a half before the second day of trial was scheduled to begin, the prosecutor confirmed that the State had not provided Cabrera with a copy of the library footage. After Cabrera's trial counsel arrived at the courtroom that morning, the DPA handed him a copy of the footage. After the trial judge took the bench, the parties brought the issue to the court's attention and the court granted defense counsel's request for time to review, among other things, the surveillance camera footage, providing them roughly an hour and a half to do so.

The copy of the footage provided to the State by the retail store was a 15- to 20-minute compilation of video clips that were recorded any time the surveillance camera detected motion throughout the day on January 23, 2023. As represented to the court by the parties and later found by the trial court,

> 1.58   The surveillance footage from the outside of [the retail store] shows part of the mall parking lot and the full walkway up to the rear entrance to the library and shows the rear library entrance.

---

[2] During his review, Cabrera's trial counsel also realized that the State had only provided him with a 3-minute excerpt of a 32-minute recording of a phone call between Cabrera and V that was in the State's possession.

All the footage has a date stamp of January 23, 2023, but there are no time stamps, so the parties rely on lighting to determine the approximate time of day.

1.59   The earliest portion of the surveillance video appears to be in the morning, and it is undisputed that [V] and Mr. Cabrera initially went to the library in the morning to do training before cleaning in the evening.  *The video shows them walking casually side by side from the parking lot to the rear entrance and appearing to chat with each other.*

1.60   The next part of *the video shows [V] and Mr. Cabrera exiting the rear of the library once again walking casually side by side from the library to the parking lot while chatting.*

1.61   The video continues and shows *footage from the early evening.  [V] and Mr. Cabrera once again casually walk side by side from the parking lot to the rear entrance while chatting and entering the library.*

1.62   Sometime later in the evening, the video shows Mr. Cabrera exiting the library alone from the rear and going to the parking lot.  He returns a short time later with what appears to be cleaning supplies.

1.63   At the latest part of the evening, *the video shows [V] and Mr. Cabrera coming out the rear door of the library together.  Mr. Cabrera can be seen showing [V] how to lock and unlock the door multiple times and [V] practices opening and closing the door.  They then walk casually to the parking lot side by side, and the video footage concludes with what appears to be a different angle showing the parties driving off in their respective vehicles.*

(Emphasis added.)[3]

After viewing the footage, Cabrera's defense counsel inquired with the DPA as to whether the State intended to proceed with the prosecution in light of its not disclosing the footage in discovery.  The prosecutor and Swenningson then left the courtroom and "talk[ed] to [V] about the video" using what the DPA characterized as "'very non-leading questions.'"  The prosecutor told the court that "[V] said that

---

[3] To the extent that the State asserts on appeal that the trial judge erred because he did not view the video footage himself, this argument was waived in the trial court.  The record reflects that the judge informed the parties that he "relied upon representation of [c]ounsel to describe bits of information from the video," "[b]oth parties had opportunities to do that," "there was not a suggestion given by either [c]ounsel that [the court] take a moment and look at the video," and "[the court] relied upon the guidance of [c]ounsel."

she did walk out of the library with Mr. Cabrera after the alleged sexual assault and did so because of . . . 'power and control dynamics.'" The DPA further indicated that the State intended to continue with the prosecution.

In response, Cabrera's counsel moved to dismiss the case with prejudice on the basis of the State's untimely disclosure of the surveillance camera footage.[4] After hearing and considering arguments from both parties, the court first determined that the State had committed a discovery violation.

The court then invited the parties to suggest a remedy for the violation. Cabrera again requested dismissal with prejudice and the State instead argued no remedy was necessary because the conduct depicted in the video recording was consistent with V's expected testimony. Cabrera's counsel responded that the State, after viewing the video and speaking with V, had now changed its theory of the case to be that V's testimony and her behavior was consistent with a "power and control dynamic" created by Cabrera.

The court then considered whether Cabrera was prejudiced by the State's failure to disclose the video recording and the viability of alternative remedies as a result. The court reasoned,

> [A]s far as a remedy, there's, you know, it has to be fact specific, and with the knowledge that a dismissal is an extraordinary remedy. It doesn't say that that's forbidden, but it says you have to, basically, be really careful. If you're thinking dismissal, that's a huge step, is what it's saying. Be super, super, super careful about that.
>     So, what I think is important here is that the [sic] couple of considerations. One, the only non-word evidence we have about any

---

[4] Cabrera also asserted that the State breached its duty to disclose other evidence. However, given our resolution of this matter, we need not consider this assertion. In addition, Cabrera sought dismissal pursuant to governmental mismanagement under CrR 8.3, premised on the same discovery violation, but, again, given our resolution of this matter, we need not consider that additional basis.

> of these sexual assaults is contained in this video surveillance from near the library on January 23rd. That's important, I think, because in a he said/she said, it's a credibility determination. And then anything that goes beyond words, because we all know that words can be, we can be inaccurate, imprecise in our language, there's a lot to be read into words.
>
> And then when you have an additional piece of video evidence that can shed light on maybe what a person was thinking, or how they were moving, I think that's—that's fairly significant. And it does—it does shed some light on credibility [sic] of [V]. You know, she indicates X, Y, and Z with her words, and then she manifests A, B, and C, with her actions, which are captured by the video.

The court acknowledged that the alleged inconsistencies with V's words and her conduct, as emphasized by defense counsel in argument,

> may be self-preservation; that may be acquiescing to the power and control dynamic that exists. That she's aware that if she does something untoward, her mom or dad or family is going to be fired, and they're out on the street because they become homeless because they don't have funds. And Mr. Cabrera very well be aware of immigration status, and that may be a tool that he could use against them. You know, there's a whole host of things that could come to play.

Nevertheless, the court concluded,

> But that one piece of nonverbal testimony provides an argument, or at least footing for an argument, for the [d]efense to argue that credibility is called into question for everything else, because all the other allegations are based on words. And if her words are called into question here, you know, and the jury doesn't have to believe what the [d]efense argued, they may just wholly reject that and say, you know, the video shows X, Y, and Z, and we agree with that, or don't agree with that. So, I think that's a fairly big item that does tend to cast a bit of shadow, potentially, if the jury tended to believe that over all of her testimony.

The court then recognized the impact that the late disclosure had on Cabrera's opening statement to the jury from the day before and stated,

> There's also something to be said about opening statement. Opening statement kind of paints a picture for the jury. And that picture, they always talk about the law of primacy and recency. The

idea is that the law of primacy is like the first thing that kind of imprints upon your mind is kind of a big deal, because that provides the superstructure, if you will, and which pieces are going to be attached to during the trial. And then the recency is just kind of the last thing that somebody hears, it kind of lingers and has an impact on somebody's thought process.

So, here, the imprinting upon the jury was limited in the fact that this video wasn't in the possession of the [d]efense to help create that impression. So, I think that's important to note.

The court considered and rejected the notion of granting a continuance, ruled that dismissal with prejudice was appropriate under the particular facts and circumstances of the case, and dismissed the State's prosecution against Cabrera.

The trial court later issued a written order ruling that it was dismissing the prosecution against Cabrera based on, among other things, the State's discovery violation arising from its failure to disclose to him the surveillance camera footage within its knowledge that tended to negate his guilt for the offenses charged.[5] The State timely appealed to Division Two of this court, who then transferred the matter to Division One for resolution.[6]

ANALYSIS

The State asserts that the trial court abused its discretion when it dismissed with prejudice its prosecution of Cabrera due to the trial DPA's late disclosure of the library surveillance camera footage. We disagree.

---

[5] The trial court also indicated that other bases warranted the dismissal of the State's prosecution against Cabrera. Given our resolution of this matter, we decline to consider them.

[6] We note that although the State's appellate briefing challenges the court's final order dismissing the prosecution, its briefing does not present argument or authority in support of its challenge to the other orders and rulings described in its notice of appeal and amendment thereto. Accordingly, these other challenges have been abandoned on appeal.

I.     Trial Prosecutor's Discovery Violation under CrR 4.7

The State first contends that the trial court abused its discretion when it concluded that the DPA's late disclosure constituted a discovery violation. The State's contention fails.

CrR 4.7 governs discovery in prosecutions. *State v. Pawlyk*, 115 Wn.2d 457, 471, 800 P.2d 338 (1990). The scope of this discovery is within the trial court's discretion, and we will not disturb the court's discovery decision absent a manifest abuse of that discretion. *State v. Yates*, 111 Wn.2d 793, 797, 765 P.2d 291 (1988). We have explained,

> It is the long settled policy in this state to construe the rules of criminal discovery liberally in order to serve the purposes underlying CrR 4.7, which are "to provide adequate information for informed pleas, expedite trials, *minimize surprise*, *afford opportunity for effective cross-examination*, and *meet the requirements of due process . . .*". *State v. Yates*, 111 Wn.2d 793, 797, 765 P.2d 291 (1988) (quoting Criminal Rules Task Force, *Washington Proposed Rules of Criminal Procedure* 77 (West Pub'g Co. ed. 1971)). To accomplish these goals, *it is necessary that the prosecutor resolve doubts regarding disclosure in favor of sharing the evidence with the defense*.

*State v. Dunivin*, 65 Wn. App. 728, 733, 829 P.2d 799 (1992) (emphasis added) (alteration in original).

As pertinent here, CrR 4.7(a)(3) provides that "the prosecuting attorney shall disclose to defendant's counsel *any material* or information within the prosecuting attorney's knowledge *which tends to negate defendant's guilt as to the offense charged*." (Emphasis added.) This duty extends to the disclosure of exculpatory evidence and impeachment evidence. *See City of Seattle v. Lange*, 18 Wn. App. 2d 139, 149, 151-52, 491 P.3d 156 (2021) (discussing CrR 4.7(a)(3) and CrRLJ 4.7(a)(3)). Exculpatory evidence is defined as "[e]vidence tending to

establish a criminal defendant's innocence." BLACK'S LAW DICTIONARY 698 (12th ed. 2024). Impeachment evidence is defined as "[e]vidence used to undermine a witness's credibility." *Id.*

The trial court did not err when it ruled that the State's late disclosure of the library surveillance camera footage violated CrR 4.7(a)(3). The record reflects that the footage constituted material that the State owed a duty to disclose to Cabrera under CrR 4.7(a)(3) and the State failed to timely disclose this material to him. First, the State does not dispute that the trial prosecutor failed to disclose to Cabrera its copy of the footage until the morning of the second day of trial, after opening statements had been made. The State also does not dispute that the footage was "material . . . within the prosecuting attorney's knowledge" under CrR 4.7(a)(3). Indeed, at trial, when speaking of the copy of the video recording, the DPA acknowledged, "I haven't reviewed it, . . . I read it in the report . . . , I saw surveillance video, . . . did not see that it was missing, so, I haven't seen the video."

Furthermore, the footage was plainly relevant as circumstantial evidence tending to negate Cabrera's guilt of the offenses charged. The State's theory of the case was that Cabrera had repeatedly engaged in sexual and other misconduct against V over a span of several months, including on the day when they were recorded together on the surveillance footage. Cabrera's theory of his defense was that he did not engage in such misconduct. The recording of the video footage depicted V and him "walking casually" next to one another and "chatting" together on multiple instances throughout that day, including in the aftermath of one of the alleged instances of sexual misconduct. A potential reasonable inference to be

drawn from the footage is that because it depicted V interacting casually with Cabrera throughout the entire day, he had not engaged in sexual or other misconduct toward her either before January 23, 2023, or at some point on that day. Such an inference is plainly relevant to supporting Cabrera's theory of the case and, therefore, relevant to undercutting the State's ability to carry its burden as to the charged crimes.

In addition, the footage was relevant to undermining V's credibility as the central witness in the State's case against Cabrera. For instance, V had reported to KPD and during her interview with Cabrera's trial counsel that Cabrera had repeatedly engaged in sexual and other misconduct against her. Her testimony was expected to reflect her report of his alleged misconduct. Therefore, for the same reasons as discussed *supra*, the video footage depicting their casual interactions with one another could reasonably lead a jury to discount her testimony regarding her report of such incidents.

Moreover, the video could reasonably be used to argue the inconsistencies in V's pretrial statements regarding the alleged misconduct. For instance, V initially reported to KPD that on the evening of January 23, 2023, she had fled from Cabrera and left through the library's rear door, but her report did not indicate that she exited the library alongside Cabrera that night. Then, during her defense interview, she stated that although she initially fled from him after his alleged misconduct, they later exited the library together. The last segment of the video footage depicted her and Cabrera exiting the library together. Therefore, the footage tended to undermine, at a minimum, the veracity of the initial report that

she made to the police, thereby having the potential to negatively impact her credibility as a witness before the jury.[7]

The State nevertheless contends that the evidence was cumulative and therefore not material. The State is mistaken. We have previously recognized that proof of materiality, as required in *Brady v. Maryland*[8] and its progeny, is not required with regard to CrR 4.7(a). *See Lange*, 18 Wn. App. 2d at 150. Rather, "a defendant must prove *Brady* materiality only when the material or information sought is not discoverable under subsections (a), (c), or (d) of the rule." *Id.* As explained herein, the footage was plainly discoverable under subsection (a) of CrR 4.7. *See* CrR 4.7(a)(3). Thus, the trial court did not err when it concluded that the State violated CrR 4.7 when the DPA failed to timely disclose the library surveillance camera footage to Cabrera.

II.     Prejudice To Cabrera and Trial Court's Dismissal Order

The State next contends that the trial court abused its discretion when it determined that dismissal with prejudice of the State's prosecution of Cabrera was warranted due to the circumstances surrounding its discovery violation. The trial court did not err.

CrR 4.7(h)(7) regards sanctions for discovery violations and subsection (i) thereof sets forth that

> [i]f at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an

---

[7] The State similarly argued before the trial court, and reiterates on appeal, that it had no duty to disclose the footage because the evidentiary value of the surveillance camera footage was consistent with the evidence expected at trial. However, as discussed *supra*, this is not the standard under CrR 4.7. *See Lange*, 18 Wn. App. 2d at 150.

[8] 373 U.S. 83 (1963).

> applicable discovery rule or an order issued pursuant thereto, *the court may* order such party to permit the discovery of material and information not previously disclosed, grant a continuance, *dismiss the action* or enter such other order as it deems just under the circumstances.

(Emphasis added.) We have recognized that in the context of CrR 4.7, "[t]he court's power to dismiss is reviewable only for a manifest abuse of discretion." *State v. Smith*, 67 Wn. App. 847, 851, 841 P.2d 65 (1992).

As the trial court here noted, dismissal of a criminal case, however, "is an extraordinary remedy." *State v. Krenik*, 156 Wn. App. 314, 320, 231 P.3d 252 (2010). A trial court abuses its discretion "by ignoring intermediate remedial steps" before dismissing an action. *State v. Koerber*, 85 Wn. App. 1, 4, 931 P.2d 904 (1996). For instance, our criminal rules of procedure "clearly allow the trial court to grant a continuance 'when required in the administration of justice and the defendant will not be substantially prejudiced in the presentation of the defense.'" *State v. Ramos*, 83 Wn. App. 622, 636-37, 922 P.2d 193 (1996) (quoting *Smith,* 67 Wn. App. 852 (quoting former CrR 3.3(h)(2) (1995)); *see also* CrR 3.3(f)(2). Moreover, dismissal of a prosecution "is available only when there has been prejudice to the rights of the accused which materially affected the rights of the accused to a fair trial and that prejudice cannot be remedied by granting a new trial." *State v. Baker*, 78 Wn.2d 327, 332-33, 474 P.2d 254 (1970).

"[T]he question of whether dismissal is an appropriate remedy is a fact-specific determination that must be resolved on a case-by-case basis." *State v. Sherman,* 59 Wn. App. 763, 770-71, 801 P.2d 274 (1990). Therefore, in order for the trial court's dismissal to have been appropriate here, the State's discovery

- 14 -

violation must have resulted in prejudice to Cabrera's right to a fair trial and that prejudice had to be the sort that could not have been cured by a remedy less extraordinary than dismissal.

As an initial matter, notwithstanding the remedies that the State asserts for the first time on appeal that the trial court should have considered, we emphasize that the trial DPA did not expressly propose *any* remedy to the trial court in light of the State's discovery violation. Rather, the trial court took it upon itself to consider whether a remedy short of dismissal with prejudice would be appropriate. As analyzed *infra*, the court did not err when it concluded that intermediate remedies were inadequate and dismissal was appropriate.

First, the court did not err when it concluded that the withholding of the library footage resulted in prejudice to Cabrera's right to a fair trial that could not be remedied by a continuance. The record reflects that the evidence was not disclosed until the second day of trial after opening statements had been made. The timing of this late disclosure with regard to opening statements was significant; by the time the State actually provided the footage, Cabrera's trial counsel had already told the jurors that they were *not* going to see evidence of surveillance camera footage depicting the parties together.

This resulted in Cabrera being faced with two untenable options. If he elected to present to the jury the library footage that was potentially persuasive of his innocence and to impeach the credibility of the State's central witness, he risked the jury incorrectly assuming that his trial counsel was unprepared or distrustful due to his (mis)representation in opening statement to the jury that no

such footage existed. Alternatively, if Cabrera elected to not present the jury the footage for fear of undermining his trial counsel, he would not benefit from its potential evidentiary value for his own defense, whereas the State, by violating a discovery rule, would benefit from the omission of such evidence. As a result, the State's discovery violation prejudiced Caberra's right to a fair trial before the jury that had been seated in this prosecution. Contrary to the State's argument in briefing, the grant of a continuance would not cure this prejudice. Such a remedy would result merely in the delay of the trial already underway, only for it to resume later *with the same jury* who heard the parties' opening statements. Therefore, a continuance was not available as an adequate remedy.[9]

Furthermore, although not expressly considered by the trial court, the granting of a new trial would not cure the prejudice to Cabrera's right to a fair trial arising from the State's discovery violation.[10] This is so because ordering a new trial would result in the State gaining the ability to argue a new theory of the case as a direct result of its own discovery violation in reliance on the same evidence that it failed to timely disclose. For instance, the State's late disclosure provided the DPA with the opportunity to try out a theory in front of the jury in his opening

---

[9] For similar reasons, a curative instruction would not remedy the prejudice because such an instruction would be provided to the same jury who heard the parties' opening statements. Only an instruction that definitively laid responsibility for defense counsel's misstatement regarding the absence of video footage on the shoulders of the DPA would be sufficient to insulate against or cure any loss of credibility with the jury and such an instruction would effectively eliminate the DPA's credibility.

Moreover, dismissing only the charged count arising from the alleged library incident would not cure the resulting prejudice because, as the trial court recognized, the video footage "cast a bit of shadow" over V's report of prior incidents of sexual misconduct by Cabrera and, therefore, over the State's charged offenses from prior to January 2023.

[10] We may affirm a decision of the trial court "on any basis supported by the record." *State v. Poston*, 138 Wn. App. 898, 905, 158 P.3d 1286 (2007).

statement regarding the testimony of its central witness, V: that the evidence would show that V was afraid of Cabrera and fled from him as soon as his alleged misconduct occurred. If a new trial were granted, however, the State would be afforded the opportunity to try out a different theory regarding V's testimony in light of the footage that it had previously and improperly withheld: that the footage depicting her walking casually alongside Cabrera was actually the result of power and control dynamics that he leveraged against her.[11] Consequently, an order that would effectively allow the State to have two attempts at prosecuting Cabrera as a direct result of its own discovery violation would plainly deprive him of his right to a fair trial. Therefore, a new trial would not cure the particular prejudice that resulted from the State's discovery violation in this case given the procedural posture by which it unfolded. Indeed, as our Supreme Court has recognized,

> The principles underlying CrR 4.7 require meaningful access to copies based on fairness and the right to adequate representation. The discovery rules "are designed to enhance the search for truth," and their application by the trial court should "insure a fair trial to all concerned, *neither according to one party an unfair advantage nor placing the other at a disadvantage*." *State v. Boehme*, 71 Wn.2d 621, 632-33, 430 P.2d 527 (1967).

*State v. Boyd*, 160 Wn.2d 424, 433, 158 P.3d 54 (2007) (emphasis added). Thus, based on the record before us, the trial court did not abuse its discretion when it

---

[11] Such a pivot in the State's theory of her testimony seems reasonably likely given that this was precisely the argument made to the trial court after the prosecutor had the opportunity to review the footage himself after his opening statement.

determined that dismissal was appropriate under the circumstances and applied the discovery rules to dismiss this matter with prejudice.[12]

Affirmed.

_____

WE CONCUR:

_____          _____
Birk, J.                                  Chung, J.

---

[12] The State also challenges the trial court's determination that its discovery violation deprived Cabrera of his right to a fair trial as recognized by the United States Supreme Court in *Brady v. Maryland* and its progeny, and that the State engaged in willful governmental misconduct under CrR 8.3(b). Additionally, the State contends that the trial court erred to the extent that its order was entered without proper consideration of the time remaining for Cabrera's trial. Because dismissal as a remedy expressly permitted under the plain language of CrR 4.7 is independently dispositive of the State's appeal, we decline to consider these other challenges. *See State v. Valdiglesias LaValle*, 2 Wn.3d 310, 323 n.8, 535 P.3d 856 (2023) (internal quotation marks omitted) (quoting *Wash. State Farm Bureau Fed'n v. Gregoire*, 162 Wn.2d 284, 307, 174 P.3d 1142 (2007)) ("'Principles of judicial restraint dictate that if resolution of an issue effectively disposes of a case, we should resolve the case on that basis without reaching any other issues that might be presented.'").