[No. 275-2.    Division Two.    May 5, 1971.]

THE STATE OF WASHINGTON, *Respondent,* v. ELAINE GENE-VIEVE PERKEREWICZ, *Appellant.*

938

*Frank A. Shiers* (of *Shiers, Kruse & Roper*), for appellant.

*John C. Merkel, Prosecuting Attorney,* and *Jack D. Evans, Deputy,* for respondent.

Petrie, C.J.—The defendant, Elaine Perkerewicz, was convicted of the crime of grand larceny (embezzlement). Her notice of appeal challenges (1) the form of the information, (2) the sufficiency of her arraignment, (3) a pretrial discovery order requiring her to produce income tax returns and records, (4) the propriety of several instructions to the jury, and (5) the sufficiency of the evidence to sustain a verdict of guilty.

The facts, although to a large extent circumstantial, amply support the verdict. There is a remarkable lack of disagreement as to the key facts. They may be summarized as follows:

Mrs. Perkerewicz enjoyed a supervisory position somewhat short of complete managerial responsibility with two Dairy Queen facilities at Bremerton and Port Orchard. Her responsibilities included preparation of a work schedule for all employees, ordering the basic supplies, counting and recording the cash from the previous day's activity, reading and preserving the cash register tape, preparation of a daily cash register account sheet and transmittal of the cash and report to one of the owners, Mr. George Slyter, and general supervisory responsibilities during her shift subject only to the infrequent requests of Mr. Slyter, an elderly gentleman who appeared at the place of business almost daily in time to prepare the bank deposit slip, make the deposit, and perform infrequent miscellaneous tasks of no consequence to the issues in this matter.

Every day that the stores were open for business during the pertinent period of time, October 1 to November 30, 1969, Mrs. Perkerewicz' workday started at 7 or 8 in the morning (occasionally at 6:30 a.m.), according to the work schedule which she prepared. Apparently she stopped at the Port Orchard store, but precisely what she did there is

not clear from the record. At the Bremerton store, she alone removed the cash register tape, counted the cash which had been placed in a floor safe the night before by one of the employees who had closed the store at the end of the day, put $150 back into the cash register (for daily change-making purposes), and prepared the cash register account sheet. A separate cash register account sheet was kept for each store. We are not advised specifically how the Port Orchard tape and cash reached the Bremerton store, but Mrs. Perkerewicz prepared the account for each store by first recording the running tape total and deducting therefrom the previous day's tape total. The difference in these two consecutive tape totals should produce the total sales for the day. Further, by deducting from the total sales for each day, the amount of inconsequential "overrings" and the amount of daily purchases of meat and other consumable merchandise, which had been paid by cash during the previous day and for which a voucher had been placed in the cash register, the net amount thus produced would establish the amount of "cash for banking" for each day. This amount of cash, together with the cash register tape and daily account sheet, she turned over to Mr. Slyter. He, in turn, prepared the deposit slip, took the deposit to the bank, and at the end of the month turned the accumulated tapes and daily account sheets over to the accountant.

Mrs. Perkerewicz had been instructed to "reset" the cash register tape to zero, by use of a special key, at the start of the first working day of each month. The "reading" which she took daily would thus be an accumulated reading until the last day of the month. The system might have worked fairly efficiently as a means of cash control, if, at the beginning of each day, another "reading" was actually stamped out on the tape. Instead, each day's tape merely started out with a recording of the first sale of the day. The system actually used, therefore, assumed that there had been no mechanical change in the running total within the cash register mechanism. At least three uncontroverted facts clearly establish that almost daily the internal mechanism

of the cash register in the Bremerton store had been altered in some fashion between the time the daily "reading" had been taken for the previous night's running total and the time when the machine was ready for the ensuing day's activity. It is also uncontroverted that Mrs. Perkerewicz was the only person who used the cash register during this relatively brief period of time each morning when the actual recordings were made and the tape torn out of the machine.

The three uncontroverted facts are (1) the tape endings from day to day did not match physically—indicating that a piece of tape had been torn out of the register other than the tapes used to make up the daily account sheets; (2) the transaction numbers, recorded consecutively each time a "sale" or a "reading", or a "reset" to zero was made, did not run consecutively from the end of one tape to the beginning of the next tape (there were gaps of several numbers); and (3) an adding machine run of the amount of the individual sales for each day totaled, with surprising regularity, approximately $20 per day more than what had been recorded as the total sales for each day. Indeed, the accountant's recapitulation demonstrates that for the month of October, 1969, the total actual sales over the total sales recorded on the cash register account sheet was $392.36, and for November, 1969, the total under-recording was $574.38.

Mechanically, therefore, someone was obviously "reading" the running total onto the tape, tearing the tape off, resetting the register to zero, running a series of subtotals until the machine total was approximately $20 short of the prior reading, tearing off the intervening tape and destroying the same, and then presenting the machine for the ensuing day's use. Again, Mrs. Perkerewicz was the only person who had access to, and use of, the cash register during the time interval involved. Parenthetically, we note that several penciled notations were subsequently inserted on the tape after Mrs. Perkerewicz turned them over to Mr.

Slyter. Such notations have no probative significance to the issues in this appeal, and may be totally ignored.

The sum total of the evidence, to this point, indicates solely that the cash register had been altered by approximately $20 on a daily or near daily basis. In another reconciliation, the accountant found that the daily deposits matched the previous day's recorded "money for banking" taken jointly from the two stores, except in five instances when *more* money was deposited than the recorded sales would have warranted. In two of the five instances of "overdeposits", the amount is totally inconsequential. In the other three instances, the precise amount of the overdeposit can be accounted for by a specific check[1] which the business had received, but which the jury was warranted in determining was not run through the cash register in any manner whatsoever. Thus, the recorded sales (as opposed to the actual sales), as determined by rerun of the tapes, was precisely reflected in the actual deposits to the account of the business; and the jury was warranted in inferring that the alterations to the cash register were made by Mrs. Perkerewicz and that she appropriated the shortages thereby generated to herself.

We turn, therefore, to the several legal issues presented by this appeal. Faced with the type of factual situation outlined above, the state chose to file an information charging Mrs. Perkerewicz, in two counts, with having committed the crime of grand larceny during the period October 1 to 31, 1969, in count one; and having committed the crime again during the period November 1 to 30, 1969, in count two. Somewhat anticipating the nature of the state's evidence, that during any 1 day there was no indication Mrs. Perkerewicz could conceivably have been charged with having taken $75, she challenged the method the state chose to divide the charge into two counts. She acknowledges that the state could have elected to charge her with a

---

[1] It appears that some attempt was made to correlate such checks with a rebate which wholesalers gave to the Dairy Queen stores, but the evidence on this point is not clear in the record.

series of petit larcenies or with one count of grand larceny[2] committed during the course of the entire period extending from October 1 to November 30, 1969, but that there was no valid reason to have arbitrarily divided the charge into two counts of grand larceny each committed during the period of 1 calendar month.

In support of this contention, the appellant directs our attention to *State v. Linden*, 171 Wash. 92, 102, 17 P.2d 635 (1932), in which the court stated:

> Under the law, the appellants could have been charged with a distinct offense for each appropriation, or they could have been charged with a continuing offense covering the entire period; but it was not necessary that they be charged in one of these two ways. Where the periods covered by the different counts are separate and distinct, as they are in this case, the wrongful appropriations during each period may be charged in a different count.

It is true that in *Linden,* the defendant had been charged with three counts of grand larceny, each count covering different non-adjoining periods of time extending over a 7-month span of time. However, we do not view the court's requirement that each count must cover a "separate and distinct" period of time as a prohibition on dividing the counts into consecutive calendar periods. We find no error in the manner in which this information was divided into two counts, particularly where the accounting system of the business, which Mrs. Perkerewicz was instructed to follow, contemplated that the cash register be reset to zero at the beginning of each month.

Following the impaneling of the jury, and after

---

[2]In *State v. Vining*, 2 Wn. App. 802, 472 P.2d 564 (1970), we explained that a series of acts may be combined into a single crime, where the successive takings are the result of a single, continuing criminal impulse or intent and are pursuant to the execution of a general larcenous scheme or plan; but this casts upon the state the obligation of proving as a fact that such a general scheme or plan exists, and that further, an appropriate instruction should be presented to the jury advising them that this is a necessary element of the crime charged. In the instant case the jury was so advised.

commencement of testimony, the trial court permitted the state to amend by interlineation each of the two counts of the information by inserting the words "willfully, unlawfully and feloniously." The appellant objected to the trial amendment but did not seek a continuance, nor did she claim surprise. No new substantive material was alleged by the amendment to the information. In that sense, the amendment was to form only and not to substance. It would have been a useless act to require a rearraignment under these circumstances. We find no error. *State v. Jennen*, 58 Wn.2d 171, 361 P.2d 739 (1961); *State v. Hurd*, 5 Wn.2d 308, 105 P.2d 59 (1940).

Appellant next assigns error to the court's order, upon motion of the prosecutor, requiring Mrs. Perkerewicz to permit the state to inspect "federal income tax returns and income records for tax years 1968 and 1969 of defendant and her husband, Isadore Perkerewicz"; and further permitting the state to "copy or photograph any or all documents produced for inspection pursuant to this order." The appellant contends that this order violated rights protected by both the federal and state constitutions—her right to immunity from self-incrimination (fifth amendment to the United States Constitution and article 1, section 9 of the Constitution of the State of Washington), and also her right to privacy (fourth amendment of the United States Constitution and article 1, section 7 of the Constitution of the State of Washington).

■ Without benefit of statute,[3] and without ever having promulgated formal rules therefor, this jurisdiction is committed to the proposition that the superior courts have inherent power, in criminal cases, to permit prosecutorial and defense pretrial discovery. It is a matter peculiarly within the discretion of the trial court to grant or deny each such request. *State v. Beard*, 74 Wn.2d 335, 444 P.2d 651 (1968); *State v. Grove*, 65 Wn.2d 525, 398 P.2d 170

---

[3] RCW 10.37.030 does require that the state provide to the defendant the names of the witnesses it intends to call, and similarly, the defense is required to submit names of its witnesses to the state.

(1965). There must be, minimally, a showing of need; *State v. Smith,* 77 Wn.2d 267, 461 P.2d 873 (1969); and trial courts are admonished to exercise such discretion, bearing in mind that as nearly as possible, discovery should be considered a "two-way street." *State v. Boehme,* 71 Wn.2d 621, 430 P.2d 527 (1967). Further, no statutory nor constitutional rights may be violated by any order granted. *State v. Boehme, supra.*

The state contends, and the appellant tacitly concedes, that the documents discovered were not used during trial; nor was any matter, disclosed by such discovery, used at trial. Appellant's position on this assignment of error is that prejudice is presumed from positive violation of constitutional rights, and particularly must this be so when a criminal defendant must decide whether or not to testify on her own behalf.

■ We have not been advised as to precisely what the prosecutor discovered through use of the challenged order. If, as appears to be the case, he merely obtained a copy of appellant's tax return, no right has been violated. Obtaining a copy of an income tax return does not involve testimonial compulsion. *Stillman v. United States,* 177 F.2d 607 (9th Cir. 1949).

■■ We are not advised whether the defendant was required to disclose any "income records" as required under the terms of the challenged order. Hence, we cannot measure, with any degree of exactitude, whether or not any of this defendant's constitutional rights have been violated because of the challenged order. Before we can determine whether or not Mrs. Perkerewicz has been denied a fair trial, we must know—and she has the obligation of showing us—precisely what she was required to disclose so that we may, in some manner, measure the validity of her argument that she was unconstitutionally compelled to disclose to the state evidence which "compelled" her to decide not to testify in her own behalf. We can certainly conclude, however, that beyond any reasonable doubt, whatever constitutional right, if any, she has been denied, as reflected by

the record before us, did not have any effect on the verdict of the jury. Error, therefore, if any, must be classified as harmless. *State v. Jefferson,* 74 Wn.2d 787, 446 P.2d 971 (1968).

Further discussion of this assignment of error would seem unnecessary. We believe, however, that a case-by-case development of the guidelines to be followed by bench and bar contributes to an undesirable uncertainty in the law. We would suggest to those who must go to the mat, and to those who must maintain the "two-way street," at least until formal rules are promulgated, that some attempt be made to follow the applicable federal rules permitting and limiting pretrial discovery in criminal trials.[4]

█ Finally, appellant contends that several of the trial court's instructions to the jury are in irreconcilable conflict, and others improperly advised the jury as to the law of embezzlement. It would serve no useful purpose to detail the appellant's several contentions raised by these assignments of error. We have carefully reviewed all of the instructions and conclude that as a whole they fairly and accurately advised the jury of the appropriate law to be followed under the factual pattern presented, without undue repetition or confusion.

We feel constrained to comment on one area alone. Appellant contends that instructions 10 and 11[5] unduly em-

---

[4]For an excellent discussion of some of the problems involved, *see Discovery in Criminal Cases,* a panel discussion before the Judicial Conference of the Second Judicial Circuit, September 8, 1967, 44 F.R.D. 481; also *United States v. Fratello,* 44 F.R.D. 444 (1968).

[5]Instruction 10 reads: "The consciousness of *no right to take the property* or money is sufficient to constitute a felonious intent. In other words, *the thing must be taken without any claim or right preferred in good faith.* If you find that such felonious intent existed, then it is wholly immaterial whether the property or money *was taken openly or not,* or in what manner it was appropriated."

Instruction 11 reads: "If you find that the defendant committed Grand Larceny, she is guilty of that crime, even if, at the time any money was appropriated *or taken,* the defendant did not intend to permanently deprive the owner thereof, or if she intended to repay or replace at some future time the amount appropriated *or taken,* or if she could have repaid said monies if required to do so."
(Italics ours.)

946

phasized the concept of a "taking" and served to confuse the jury as to an issue which was not before it. Undoubtedly, a portion of the use of the expressions "take" and "taken" stems from the fact that each count of the information charged Mrs. Perkerewicz with the crime of larceny under both subsections (1) and (3) of RCW 9.54.010. Such pleading in an information is not duplicitous so long as there is no repugnancy between the two subsections. *State v. Harrison,* 6 Wn.2d 625, 108 P.2d 327 (1940). Subsection (1) of the statute defines the typical "take, lead or drive away" type of larceny, whereas, subsection (3) defines the embezzlement portion of the statute. We need not determine whether or not a repugnancy exists, because at the close of trial, the court determined, correctly, that there was no evidence to warrant presentation of the charge under subsection (1) to the jury. Thereafter, the "issues" instructions advised the jury correctly of the several elements, the existence of each of which the jury had to find before they could convict Mrs. Perkerewicz of the crime of embezzlement only. Instructions 10 and 11, on the other hand, told the jury something of the law as it relates to intent. Undoubtedly, in a case as here where embezzlement only is involved, it would have been more technically correct to have limited the use of the term "take", or even to have deleted any reference thereto altogether. We do not commend the use of the specific instructions given under the present factual pattern. Nevertheless, we cannot say they improperly injected an issue into the case which was not before the jury; nor can we say they tended to confuse the jury—especially when we consider the totality of the instructions given. We find no error in the instructions of the court.

Judgment affirmed.

PEARSON and ARMSTRONG, JJ., concur.
Petition for rehearing denied June 7, 1971.
Review denied by Supreme Court July 1, 1971.