[No. 50101-1-I. Division One. December 29, 2003.]

THE STATE OF WASHINGTON, *Respondent*, v. ZACHARY A. KINNEMAN, *Appellant*.

*Nancy P. Collins* (of *Washington Appellate Project*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *John C. Carver, Deputy*, for respondent.

APPELWICK, J. — Zachary A. Kinneman, an attorney, made multiple unauthorized withdrawals from his Interest On Lawyer Trust Account (IOLTA) over 16 months. He was convicted of 28 counts of first degree theft and 39 counts of second degree theft. He appeals, asserting that (1) because the multiple counts were not aggregated into one first degree theft count, he was subject to double jeopardy and (2) the State had insufficient evidence to charge him with multiple counts. The State cross-appeals the court's imposition of an exceptional sentence downward. We affirm

Kinneman's conviction, reverse the imposition of an exceptional sentence downward, and remand for resentencing.

## FACTS

In June 1997, Zachary Kinneman, an attorney licensed to practice in the state of Washington, was hired to act as an escrow and closing agent for five separate real estate refinancings. The borrower for all five transactions was Rodney R. Brown, and the lender was Option One Mortgage Company of California (Option One). The five properties were all located in Seattle, Washington.

In four separate wirings on June 17, 1997, and one wiring on June 27, 1997, Option One wired a total of $499,506.96 to Kinneman's IOLTA account at Washington Mutual Bank. In its closing instructions, Option One directed Kinneman to obtain a title insurance policy for each of the five properties, have the borrower sign all the necessary paperwork, record the deeds of trust, and pay off all prior lienholders on the properties and other intended disbursees, such as the loan broker. Shortly after the funds were deposited in his IOLTA account, Kinneman falsely notified Option One that he had complied with all of its escrow and closing instructions. At the time Kinneman made those representations to Option One, he had not in fact paid off any of the prior lienholders and had failed to purchase title insurance on one property as dictated in the escrow and closing instructions.

Between June 17, 1997, and October 22, 1998, Kinneman made 67 separate unauthorized withdrawals from his IOLTA account, diverting over $200,000 to his own use. These unauthorized uses of escrow funds consisted of cash withdrawals, checks made payable to Kinneman, checks payable to Kinneman's other clients, and checks made payable to other individuals unrelated to the transactions for which Kinneman received the funds. Although Kinneman did not pay off any of the prior lienholders for the five properties in July 1997, as he had informed Option

One, he did pay some of the lienholders later as originally instructed. In February 1998, Kinneman removed $69,850 from the IOLTA account to pay off one prior lienholder shortly before a scheduled foreclosure. In July 1998, he removed $56,489.67 from the account to pay off a prior lienholder for the second of the five properties just prior to its scheduled foreclosure.

Federal Bureau of Investigation agents interviewed Kinneman on December 30, 1998. Kinneman told the agents that because of financial difficulties related to his divorce, he was unable to pay his bills and used the Option One funds deposits to pay some of them. On June 20, 2000, the State filed an Information charging Kinneman with theft in the first degree under RCW 9A.56.020(1)(a) and theft in the second degree under RCW 9A.56.030(1)(a). The State charged Kinneman separately for each withdrawal—28 counts of first degree theft and 39 counts of second degree theft.[1] On November 27, 2000, Kinneman filed a motion to dismiss all but one of the charges of theft filed against him. After hearing oral arguments, the trial court denied the motion. In April 2001, this court denied Kinneman's motion for discretionary review of the trial court's decision refusing to dismiss the multiple counts. Kinneman waived his right to a trial by jury and agreed to a bench trial on stipulated facts.

The trial court found Kinneman guilty of 28 counts of first degree theft and 39 counts of second degree theft as charged. His offender score was 66. With an offender score of 66, his standard sentence range was 43 to 57 months on each of the first degree theft counts and 22 to 29 months on each of the second degree counts, to run concurrently. A standard sentence range for one count of first degree theft with an offender score of 0 is 0 to 90 days. Although Kinneman was eligible for a first-time offender waiver, the

---

[1] The State originally charged Kinneman with 1 count of theft; the court later granted the State's motion to amend its original charge from 1 count to 77 counts. The trial court subsequently granted the State's motion to dismiss 10 counts, reducing the total number of counts to 67.

court declined to sentence him under that provision.[2] The trial judge departed downward from the standard sentencing range, imposing a 14-month sentence for each count to run concurrently.

Kinneman had paid the amount he had stolen, slightly over $200,000, in restitution by the date of his sentencing hearing. At a later restitution hearing, the court found that Brown's losses as a primary victim totaled $246,770.10 including interest. The court also found that Old Republic, Option One's insurer, as a secondary victim had suffered a loss of $308,616.73, including interest, due to foreclosures on Brown's properties.

Kinneman appeals. The State cross-appeals the trial court's downward departure from the standard sentencing range.

## ANALYSIS

I. Double Jeopardy

■ Kinneman asserts that his multiple withdrawals from his IOLTA account constitute a single count of first degree theft and, therefore, the State's division of his theft of the funds into multiple counts subjects him to double jeopardy.

> The double jeopardy clause of the Fifth Amendment offers three separate constitutional protections. The state constitutional rule against double jeopardy, Const. art. I, § 9, offers the same scope of protection as its federal counterpart. One aspect of double jeopardy protects a defendant from being punished multiple times for the same offense.

---

[2] The first-time offender waiver allows the court to impose up to 90 days of confinement for some first-time offenders "who have never been previously convicted of a felony in this state, federal court, or another state." RCW 9.94A.650(1), (2). The trial court has the discretion to waive the imposition of a standard range sentence and sentence a defendant under the first-time offender option. RCW 9.94A.650(2); *State v. Johnson*, 97 Wn. App. 679, 682, 988 P.2d 460 (1999). The trial court declined to grant the first-time offender waiver because Kinneman's theft amounted to a "major economic offense" and was an abuse of trust.

*State v. Adel*, 136 Wn.2d 629, 632, 965 P.2d 1072 (1998) (citations omitted).

Unit of Prosecution Analysis

■ Kinnemann was convicted of 28 counts of first degree theft under RCW 9A.56.030(1)(a) and 39 counts of second degree theft under RCW 9A.56.040. When a double jeopardy challenge relates to multiple convictions under the same statute, the proper inquiry is what "unit of prosecution" the legislature intended as the punishable act when enacting the criminal statute. *State v. Bobic*, 140 Wn.2d 250, 261, 996 P.2d 610 (2000). The unit of prosecution refers to the scope of the criminal act. *Adel*, 136 Wn.2d at 634. "When the Legislature defines the scope of a criminal act (the unit of prosecution), double jeopardy protects a defendant from being convicted twice under the same statute for committing just one unit of the crime." *Adel*, 136 Wn.2d at 634. If the legislature's intent regarding the unit of prosecution is unclear, the rule of lenity requires the court to construe the ambiguity in the defendant's favor. *Bobic*, 140 Wn.2d at 261-62.

Kinneman argues that the theft statutes under which he was charged are ambiguous as to the unit of prosecution. Kinneman therefore contends the rule of lenity requires that he be charged with one count of theft instead of 67 counts.

The first step in unit of prosecution analysis is to examine the statute in question. *State v. Turner*, 102 Wn. App. 202, 209, 6 P.3d 1226 (2000). Here, the State charged Kinneman under RCW 9A.56.020(1)(a), under which it is a theft "[t]o wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him of such property or services." RCW 9A.56.020(1)(a). A party "wrongfully obtain[s]" or "exert[s] unauthorized control" over another's property when he or she, having that property in their possession, custody, or control as an attorney or agent, "secrete[s], withhold[s], or appropriate[s] the same to his or her own use or to the use

of any person other than the true owner or person entitled thereto." RCW 9A.56.010(19)(b). The secreting, withholding, or appropriating of property to one's own use, as an attorney or agent, worth over $1,500, constitutes first degree theft. RCW 9A.56.030(1)(a). The theft of property worth over $250 constitutes second degree theft. RCW 9A.56.040(1)(a).

Kinneman argues that another case analyzing the theft statutes, *Turner*, 102 Wn. App. 202, supports his position that "[t]here is no language in these controlling statutes which suggests the Legislature intended to punish a person multiple times based on a series of takings from the same victim."

The focus of *Turner* was on the operation of the aggregation statute, former RCW 9A.56.010(17)(c).[3] In *Turner*, the defendant appealed his three convictions for first degree theft on the grounds that multiple convictions for violation of the same statute subjected him to double jeopardy. *Turner*, 102 Wn. App. at 203. Turner was a financial director who, in 72 individual acts of theft over a 10-month period, embezzled money from his employer. Turner employed four different ways or "schemes" to embezzle the money. *Turner*, 102 Wn. App. at 204. Turner (1) made a series of unauthorized payments in varying amounts to himself from his employer's payroll accounts, (2) made unauthorized payments to a third party from the payroll accounts, (3) made unauthorized payments to himself from a nonpayroll account, and (4) made unauthorized purchases on his employer's credit card. *Turner*, 102 Wn. App. at 204. These four schemes were not successive; rather, they were concurrent within the 10 months during which Turner embezzled the funds. The State initially charged Turner with one count of theft for all 72 transactions, but later amended the information to charge him with four counts of first degree theft by grouping the acts into the four schemes

---

[3] Former RCW 9A.56.010(17)(c) (1999) (amended as RCW 9A.56.010(18)(c) by Laws of 2002, ch. 97, § 1).

he used to steal the money. Turner was convicted of three of the four counts.

On appeal, Turner argued that "the first degree theft statute is unclear whether multiple thefts by different schemes or plans from the same person over the same period of time may be punished more than once." *Turner*, 102 Wn. App. at 207. The State countered that "its discretion under former RCW 9A.56.010(17)(c) (1998) to aggregate various third degree thefts to first degree theft demonstrates that the relevant unit of prosecution here is each of the multiple schemes or plans under which Turner stole funds." *Turner*, 102 Wn. App. at 207 (footnote omitted).

Engaging in a unit of prosecution analysis, this court disagreed with the State and reversed two of the three convictions, explaining:

> The first degree theft statute makes no mention of schemes or plans in distinguishing the seriousness of the crime from other degrees of theft. And there is no wording in the statute that indicates any other relevant distinction between multiple acts of theft committed against the same person over the same period of time.
>
> We conclude that the lack of clarity creates ambiguity whether multiple schemes or plans constitute separate units of prosecution under the first degree theft statute. Thus, the rule of lenity dictates that we construe this ambiguity in favor of Turner.

*Turner*, 102 Wn. App. at 209. This case does not concern the question of multiple schemes considered in *Turner*. Further, *Turner* does not hold that the State is prohibited from charging multiple counts based on separate, unauthorized withdrawals:

> We do not address whether the State was free to charge 72 individual counts of theft in this case.
>
> Because of our resolution of the double jeopardy issue, we need not reach the question of whether the court erred by determining that the multiple counts did not constitute the same criminal conduct.

*Turner*, 102 Wn. App. at 212.

■ *Turner* does not change the well-established rule that prosecutors have considerable latitude to either aggregate charges or to bring multiple charges.[4] In *State v. Perkerewicz*, 4 Wn. App. 937, 938, 486 P.2d 97 (1971), the defendant embezzled money from her employer's cash registers over a two-month period. She appealed on the grounds that the State's division of her act into two grand larceny charges, based on the business's accounting practice of resetting the register to zero at the beginning of each month, was arbitrary. *Perkerewicz*, 4 Wn. App. at 942. The Court of Appeals affirmed, finding that the State's division of charges was not in error. *Perkerewicz*, 4 Wn. App. at 942.

In *State v. Carosa*, 83 Wn. App. 380, 921 P.2d 593 (1996), on each of three separate days, a supermarket clerk took more than $250 by removing smaller amounts of money from time to time during her work shifts. She was convicted of three counts of second degree theft. *Carosa*, 83 Wn. App. at 381. She appealed, claiming that (1) she should be charged with only one count because the thefts were all part of a common plan or scheme and (2) that because she had committed multiple misdemeanors under a common plan or scheme, the State was required to aggregate the thefts into a single felony count under former RCW 9A.56.010(15)(c) (1995). *Carosa*, 83 Wn. App. at 382-84. She relied upon the rule that " '[w]hen several articles of property are stolen by the defendant from the same owner at the same time and at the same place, only one larceny is committed.' " *Carosa*, 83 Wn. App. at 382-83 (quoting 3 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 346, at 366 (15th ed. 1995)); *State v. Brooks*, 77 Wn. App. 516, 520, 892 P.2d 1099 (1995). The court disagreed with her "same time and place" restriction, hold-

---

[4] *See, e.g., State v. Lewis*, 115 Wn.2d 294, 299, 797 P.2d 1141 (1990) (recognizing that prosecutors are "vested with wide discretion in determining how and when to file criminal charges"); *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984) ("[w]hether the incidents are to be charged separately or brought as one charge is a decision within prosecutorial discretion"); *State v. Pettitt*, 93 Wn.2d 288, 295, 609 P.2d 1364 (1980) (acknowledging that prosecutorial discretion in charging assumes a prosecutor "will exercise [that discretion] after an analysis of all available relevant information").

ing that the evidence "was sufficient to establish that Carosa committed a single larceny at the same time and place, on three different work shifts, each constituting second degree theft." *Carosa*, 83 Wn. App. at 383.

■■ Similarly, the record here contains sufficient evidence to support a finding that each of Kinneman's withdrawals constituted a separate theft. Initially, Kinneman lawfully held the funds in his IOLTA account in trust. To the extent that he made authorized withdrawals for payments to third party lienholders as directed by his client, he exercised lawful control of the funds in the account. No theft of any portion of the funds occurred until the point in time at which Kinneman made an unauthorized removal of that sum from the IOLTA account. These withdrawals were spread over a 16-month period. The thefts occurred in the same place from the same victim. However, the thefts did not occur at the same time. Accordingly, each separate withdrawal can be viewed as a discrete theft.

The unit of prosecution under RCW 9A.56.030(1)(a) for first degree theft was $1,500, and under RCW 9A.56.040(1)(a) for second degree theft was $250, for each unauthorized withdrawal. The State had the discretionary authority to charge Kinneman with a separate count of theft for each discrete, unauthorized withdrawal he made from his IOLTA account. He was not subject to double jeopardy for 67 theft convictions where each was based on a discrete, unauthorized withdrawal.

## II. Sufficiency of Evidence

Kinneman also asserts that there was insufficient evidence to convict him of 67 counts of theft.

■■ To carry its burden of proof for each charge, the State must prove the following elements beyond a reasonable doubt: (1) that Kinneman exerted unauthorized control over Option One's property and (2) that the value of the

property exceeded $1,500 (for first degree theft) or $250 (for second degree theft).[5]

> The State has the burden of proving each element of the crime charged beyond a reasonable doubt. On a challenge to the sufficiency of the evidence, the appellate court decides whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. All reasonable inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."

*State v. Greathouse*, 113 Wn. App. 889, 906, 56 P.3d 569 (2002) (citations omitted) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).

Kinneman maintains that the acts involved a single victim and place and were acts closely connected in time. He argues that the State was also required to prove the 67 counts of theft were not a single larceny, but were the result of separate criminal impulses, and not the result of a single criminal impulse. Kinneman relies on *State v. Vining*, 2 Wn. App. 802, 472 P.2d 564 (1970) and *State v. Barton*, 28 Wn. App. 690, 626 P.2d 509 (1981) to support his argument.

In *Vining*, the defendants challenged the State's practice of aggregating lesser levels of theft to charge them with a greater level of theft. Vining was convicted at trial of one count of grand larceny and argued on appeal that he should have been charged instead with several counts of petit larceny, which would have resulted in a lesser sentence. This court on appeal affirmed the grand larceny conviction, stating:

> Where property is stolen from the same owner and from the same place by a series of acts there may be a series of crimes or there may be a single crime, depending upon the facts and circumstances of each case. If each taking is the result of a

---

[5] The "exerts unauthorized control" theft alternative includes what was referred to as "embezzlement" under prior law. *State v. Joy*, 121 Wn.2d 333, 339, 851 P.2d 654 (1993).

separate, independent criminal impulse or intent, then each is a separate crime, but, where the successive takings are the result of a single, continuing criminal impulse or intent and are pursuant to the execution of a general larcenous scheme or plan, such successive takings constitute a single larceny regardless of the time which may elapse between each taking. This is a factual question which must be determined by the jury.

*Vining*, 2 Wn. App. at 808-09 (citations omitted). The *Vining* court stated that, provided the jury is properly instructed that the State must prove a general scheme, a prosecutor *may* charge one count of felony theft rather than multiple counts of a lesser theft. *Vining*, 2 Wn. App. at 808-09.

In *Barton*, a defendant charged with first degree theft and five counts of forgery argued that "the five acts of second degree theft were improperly aggregated in the information to charge one count of first degree theft." *Barton*, 28 Wn. App. at 694. Relying on the common law principle articulated in *Vining*, the court held that "property stolen from the same owner and from the same place by a series of acts constitutes one crime if each taking is the result of a single continuing criminal impulse or intent pursuant to a general larcenous scheme or plan." *Barton*, 28 Wn. App. at 694 (citing *Vining*, 2 Wn. App. at 808). The aggregation was allowed.

However, neither *Vining* nor *Barton* stand for the proposition that the converse is true: it is not incumbent upon the State to prove that separate thefts are the result of independent criminal impulses if, as here, it chooses not to aggregate counts. Neither *Vining* nor *Barton* stands for the proposition that theft from the same owner at the same place must be charged as a single scheme. The aggregation cases permit, but do not require, the State to aggregate charges in order to charge a defendant with a higher degree of a crime when the State believes a single scheme can be proved. *See, e.g., Carosa*, 83 Wn. App. 380; *State v. Hoyt*, 79 Wn. App. 494, 904 P.2d 779 (1995); *Barton*, 28 Wn. App. 690; *Perkerewicz*, 4 Wn. App. 937.

"Where property is stolen from the same owner and from the same place by a series of acts there may be a series of crimes or there may be a single crime, depending upon the facts and circumstances of each case." *Vining*, 2 Wn. App. at 808. Kinneman does not dispute that he made 67 separate unauthorized withdrawals from his IOLTA accounts over a period of 16 months. The record supports a finding that the State has proved beyond a reasonable doubt that (1) Kinneman exerted unauthorized control over Option One's property each time he made an unauthorized withdrawal from his IOLTA account, (2) that the value of each of the 28 withdrawals exceeded $1,500 (for first degree theft), and (3) the value of each of the 39 withdrawals exceeded $250 (for second degree theft). The trial court declined to enter a finding that Kinneman's 67 unauthorized withdrawals from his IOLTA account were a single crime rather than a series of crimes. Based on the stipulated evidence, the trial court did not abuse its discretion in considering the separate withdrawals to be separate crimes.

III. Exceptional Sentence

The State cross-appeals the imposition of an exceptional sentence downward from the standard range of 43 to 57 months to 14 months. The State asserts that the reasons adopted by the trial court to justify the exceptional sentence are unsupported by the record and are insufficient as a matter of law.

▮ Kinneman asserts that because the State has failed to assign error to any findings of fact as required under RAP 10.3(g), all findings must be treated as verities on appeal.[6] Unchallenged findings of fact are verities on appeal. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801,

---

[6] RAP 10.3(g) provides:

A separate assignment of error for each instruction which a party contends was improperly given or refused must be included with reference to each instruction or proposed instruction by number. A separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number. The appellate court will review only a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto.

808, 828 P.2d 549 (1992). However, "[i]n a case where the nature of the appeal is clear and the relevant issues are argued in the body of the brief . . . so that the court is not greatly inconvenienced and the respondent is not prejudiced, there is no compelling reason for the appellate court not to exercise its discretion to consider the merits of the case or issue." *State v. Olson*, 126 Wn.2d 315, 323, 893 P.2d 629 (1995). In this case, the State clearly challenges finding of fact 8 as clearly erroneous in the body of its brief. Therefore, notwithstanding the State's failure to follow the requirements of RAP 10.3(g), we address the cross-appeal of the exceptional sentence.

Generally, a court must impose a sentence within the standard sentence range. *State v. Fowler*, 145 Wn.2d 400, 404, 38 P.3d 335 (2002). It may, however, impose a sentence above or below the standard range for reasons that are "substantial and compelling." RCW 9.94A.535. An applicable express basis for a downward exceptional sentence is provided in the statute:

> The operation of the multiple offense policy of RCW 9.94A.589 results in a presumptive sentence that is clearly excessive in light of the purpose of this chapter, as expressed in RCW 9.94A.010.

RCW 9.94A.535(1)(g).

 Washington courts first analyzed RCW 9.94A.535(1)-(g)'s application to exceptional sentences in a line of controlled narcotic buy cases. *State v. Sanchez*, 69 Wn. App. 255, 848 P.2d 208, *review denied*, 122 Wn.2d 1007 (1993); *State v. Hortman*, 76 Wn. App. 454, 886 P.2d 234 (1994), *review denied*, 126 Wn.2d 1025 (1995). In both cases, the State appealed the exceptional sentences downward. On appeal, the *Hortman* court articulated the rationale and proper application of the multiple offense policy:

> Whether a given presumptive sentence is clearly excessive in light of the purposes of the SRA [Sentencing Reform Act of 1981] is not a subjective determination dependent upon the individual sentencing philosophy of a given judge. Rather, it is

an objective inquiry based on the Legislature's own stated purposes for the act. *See* RCW 9.94A.010 (setting forth the purpose of the SRA). *Sanchez holds that a presumptive sentence calculated in accord with the multiple offense policy is clearly excessive if the difference between the effects of the first criminal act and the cumulative effects of the subsequent criminal acts is nonexistent, trivial or trifling.* We fully agree. The purposes of the SRA include ensuring punishments that are proportionate to the seriousness of the offense and the offenders' criminal history, promoting respect for the law by providing punishment which is just, encouraging commensurate punishments for offenders who commit similar offenses, protecting the public, offering the offender an opportunity for self-improvement and making frugal use of the State's resources. RCW 9.94A.010.

*Hortman,* 76 Wn. App. at 463-64 (emphasis added).

In *State v. Calvert,* 79 Wn. App. 569, 903 P.2d 1003 (1995), this court applied the *Sanchez* test for the first time in a check forgery case under RCW 9A.60.020. In the case before us, the trial court cited *Calvert* as the legal basis for its application of the multiple offense policy. We find the *Sanchez* test equally applicable here to the first and second degree theft charges under RCW 9A.60.020 and .030.

The *Sanchez* test involves a factual inquiry to determine whether cumulative effects have occurred. The trial court found that the cumulative effect of Kinneman's crimes was virtually nonexistent and that the multiple offense policy was a mitigating factor supporting a downward exceptional sentence. We must determine whether the exceptional sentence is supported by the facts.

The trial court entered the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT

1. Defendant has no prior criminal history, is extremely remorseful, has cooperated with the authorities, and is at virtually no risk of reoffending.

2. Defendant was convicted of [67] counts of theft by embezzlement. Pursuant to the multiple offense policy of RCW

9.94A.400,[7] the minimum standard range sentence for those multiple convictions is 43 months.

3. The multiple counts of theft resulted from a single plan or scheme to make personal use of funds transferred to defendant in his role as escrow agent for Option One. The funds were to be used in refinancing five parcels of real property owned by Rodney Brown.

4. At the time of the thefts, defendant was a practicing attorney whose marriage and law practice were failing. Defendant was clinically depressed and contemplated suicide.

5. Although the thefts occurred at a difficult period in defendant's life, he accepts full responsibility for his bad decision to make personal use of the escrow funds. In recognition of the nature of his misconduct, defendant voluntarily gave up his license to practice law.

6. Defendant is eligible for sentencing under the first time offender option, but the court does not find that to be an appropriate option in this case.

7. In a factual sense, all the counts of theft resulted from the same course of conduct. Each count reflected a single withdrawal from, or check drawn upon, the same escrow fund account.

8. The cumulative effect of the [67] separate crimes was virtually nonexistent. The harm to Option One would have been exactly the same had defendant written one check or made one withdrawal, instead of [67] separate checks and withdrawals.

9. The total amount that defendant withdrew from the escrow fund account for his own benefit was $208,713.10. Defendant has repaid that amount by depositing a cashier's check in the amount of $208,213.10 [sic] with the Clerk of Court, pending disbursal pursuant to a restitution order.

## II. CONCLUSIONS OF LAW

1. It is a mitigating circumstance under RCW 9.94A.535 . . . that operation of the multiple offense policy of RCW 9.94A.589 . . . results in [a] presumptive sentence that is clearly excessive in light of the purpose of the [SRA] . . . .

---

[7] Former RCW 9.94A.400 (2000) (*recodified as* RCW 9.94A.589 by LAWS OF 2001, ch. 10, § 6).

2. Under RCW 9.94A.010(1), (2), and (3), the goals of the [SRA] are that punishment be proportionate, just and commensurate with the punishment imposed on others committing similar offenses.

3. A proportionate, just and commensurate sentence in this case is a 14-month sentence. The multiple charges arose from the same course of conduct in a factual sense, if not a clearly legal sense, *see State v. Calvert*, 79 Wn. App. 569, 903 P.2d 1003 (1995): there is no appreciable difference in harm resulting from the defendant's multiple takings, as opposed to his having written one large check. *Id*.

4. Other goals of the [SRA] are to protect the public, offer the offender an opportunity to improve himself, and make frugal use of the state's resources. RCW 9.94A.010(4), (5), and (6). Because [Kinneman] is at virtually no risk of reoffending, is sincerely remorseful, has accepted responsibility for his conduct, and has already paid into the Court Registry sufficient funds to repay the money taken, each of these goals is served by an exceptional sentence of fourteen (14) months.

The State asserts that the record does not support finding of fact 8.

In order to reverse a sentence below the standard range, the appellate court must find either (1) that the sentencing judge's reasons are not supported by the record, (2) that those reasons do not justify a sentence below the standard range, or (3) that the sentence imposed is clearly too lenient. Under the first prong, we determine whether the reasons are clearly erroneous in light of the record.

*Calvert*, 79 Wn. App. at 579 (citations omitted).

Here, a bench trial was conducted under stipulated facts. The stipulated facts established that Kinneman wrote unauthorized checks over a 16-month period, depriving Brown, the primary victim, of $208,713.10. The record establishes that Kinneman deposited that amount into the Court Registry before judgment and sentence. It also establishes that as a result of Kinneman's thefts only one of the five properties for which funds were deposited into Kinneman's IOLTA account was not lost to foreclosure.

Moreover, Option One, a secondary victim, incurred losses in excess of $250,000 as a result of Kinneman's thefts and the resulting foreclosures.[8]

The *Sanchez* test asks whether the difference between effects of the first criminal act and the cumulative effect of the subsequent criminal acts is nonexistent, trivial, or trifling. *Hortman*, 76 Wn. App. at 463-64. Kinneman's first criminal act was a withdrawal of $400.00. A cumulative effect of Kinneman's 67 thefts totaling $208,713.10 was the foreclosure of four of the five properties for which funds had been deposited in his IOLTA account. Nothing in the record suggests the first theft would have caused the foreclosures and loss of the real property. Therefore, the cumulative effect cannot be said to be nonexistent, trivial, or trifling.

▌ Accordingly, finding of fact 8 is not supported by the record and is thus clearly erroneous. The remaining findings of fact are unchallenged and are therefore verities on appeal. *Cowiche Canyon*, 118 Wn.2d at 808.

▌ Under the second prong of the exceptional sentence test, we use the de novo standard to examine whether each factual finding constitutes a substantial and compelling reason for departure from the standard range as a matter of law. *State v. Borg*, 145 Wn.2d 329, 336, 36 P.3d 546 (2001).

The trial court's exceptional sentence rested on conclusion of law 3, which in turn was based upon finding of fact 8. Because finding of fact 8 is clearly erroneous, it may not be the basis upon which to conclude that the cumulative effects of Kinneman's 67 acts of theft were nonexistent, trivial, or trifling, as required for application of the multiple offense policy. *Hortman*, 76 Wn. App. at 463. There is no other basis upon which to apply the multiple offense policy and objectively conclude that Kinneman's standard range sentence is excessive. Accordingly, conclusion of law 3 is error as a matter of law.

---

[8] In sum, the court awarded restitution representing financial loss and reasonable interest of $246,770.10 to Rodney Brown and $308,616.73 to Option One's insurer.

 Conclusion of law 1 restates the effects of RCW 9.94A.535. Standing alone, it provides no factual basis for an exceptional sentence. Conclusion of law 2 and the first sentence of conclusion of law 4 are mere restatements of the purposes of the SRA. "[T]he purposes of the [SRA] enumerated in RCW 9.94A.010 are not in and of themselves mitigating circumstances. Rather, they may provide support for the imposition of an exceptional sentence once a mitigating circumstance has been identified by the trial court." *State v. Alexander*, 125 Wn.2d 717, 730 n.22, 888 P.2d 1169 (1995). A trial court's desire that a defendant improve himself "through community service while limiting prison overcrowding does not justify departure from the standard sentencing range since the Legislature already considered these purposes when establishing the presumptive sentencing ranges." *State v. Freitag*, 127 Wn.2d 141, 145, 896 P.2d 1254 (1995).

 The remainder of conclusion of law 4, states:

Because [Kinneman] is at virtually no risk of reoffending, is sincerely remorseful, has accepted responsibility for his conduct, and has already paid into the Court Registry sufficient funds to repay the money taken, each of these goals is served by an exceptional sentence of fourteen (14) months.

None of these are valid mitigating factors. It is "well-established that the risk of reoffense is not a substantial and compelling reason for an exceptional sentence" because "protection of the public has already been considered by the legislature in computing the presumptive sentencing range." *Fowler*, 145 Wn.2d at 409 (citations omitted). For the same reason, Kinneman's lack of prior history is not a substantial and compelling reason for an exceptional sentence. Neither is remorse a valid mitigating factor. *State v. McClarney*, 107 Wn. App. 256, 263, 26 P.3d 1013 (2001) ("using remorse as a mitigating factor would undermine the SRA's focus on meting out the appropriate punishment for a particular crime"), *review denied*, 146 Wn.2d 1002 (2002). Finally, Kinneman's acceptance of responsibility and his partial restitution by depositing the amount he stole into

the Court Registry are not valid mitigating factors. Responsibility and reimbursement are statutorily recognized as mitigating factors only prior to detection. RCW 9.94A.535-(1)(b). Kinneman's acceptance of responsibility and his partial restitution did not occur until after he was apprehended for his crimes.

The multiple offense policy is not supported by the facts and circumstances of this case. No mitigating factor other than the multiple offense policy has been identified to support a downward exceptional sentence. The findings of fact do not provide a substantial and compelling reason for departure from the standard range sentences as a matter of law. Having concluded the exceptional sentence is not supported in fact or law, we need not evaluate whether it was too lenient under the third prong of the test.

▮▮ Finally, we must decide the nature of the remand:

> The general rule is that if the appellate court determines that all of the factors relied upon by the trial court are insufficient to justify an exceptional sentence, the court will remand for resentencing within the standard range. However, where the appellate court determines that the trial court misconstrued and misapplied the law, aside from the question of the sufficiency of the reasons given for an exceptional sentence, the court may reverse and remand for resentencing in accord with the legal principles stated in the court's opinion. . . .

*State v. Ha'mim*, 132 Wn.2d 834, 847, 940 P.2d 633 (1997) (citations omitted). Having concluded that the factor relied upon in support of a downward exceptional sentence, the lack of cumulative effect, was insufficient, the appropriate sentence is within the standard range.

We affirm the trial court's conviction and remand for resentencing consistent with this opinion.

BECKER, C.J., concurs.

ELLINGTON, J. (concurring) — I write separately to express my view that determining whether the multiple offense

policy results in a clearly excessive sentence is not necessarily a question of comparing the effects of the first crime to the effects of all the others, but may also be a comparison of the difference between the cumulative effects of multiple small thefts versus the effect of one large theft. In *State v. Calvert*, 79 Wn. App. 569, 903 P.2d 1003 (1995), the defendant was charged with five counts of forgery. *Calvert's* approach was to examine the difference between the effects of one forgery, and the effects of five smaller forgeries reaching the same total. The court held that given the circumstances of the crimes, the trial court was within its discretion to determine that "the minimal cumulative effects of the crimes were substantial and compelling reasons for imposing an exceptional sentence" because the multiple offense policy of RCW 9.94A.400 resulted in a sentence that was clearly excessive under former RCW 9.94A.390(1)(g) (1990). *Calvert*, 79 Wn. App. at 583.

This is a sensible application of the *Sanchez*[9] test in theft cases. In multiple drug offense cases like *Sanchez* and *Hortman*,[10] the comparison is like to like—the transactions were legally identical, were solicited by police officers, took place over a short time, and involved similar amounts of contraband. It is not surprising the sentencing courts believed the differences in cumulative effects were minimal.

It is useful to recall that the *Sanchez* analysis proceeds from the decision in *State v. Batista*, 116 Wn.2d 777, 808 P.2d 1141 (1991), in which the court considered whether the multiple offense policy resulted in a sentence that was clearly too lenient. The *Batista* court held two bases exist for an aggravated sentence under this policy: the "egregious effects" of the multiple offenses or the level of defendant's culpability, either of which must be "beyond what is accounted for in presumptive sentencing." *Batista*, 116 Wn.2d at 787-88. Those are the same factors that must be trivial or trifling in order to justify a mitigated sentence on grounds

[9] *State v. Sanchez*, 69 Wn. App. 255, 848 P.2d 208 (1993).

[10] *State v. Hortman*, 76 Wn. App. 454, 886 P.2d 234 (1994).

the multiple offense policy results in a sentence that is clearly excessive. *Sanchez*, 69 Wn. App. at 260-61.

Applying this analysis in a case of multiple drug transactions, the *Sanchez* court chose to ignore the first transaction, becasue its effects would be suffered regardless, and looked to see whether the later transactions added measurably to the harm caused by the first. This is consistent with *Batista*. But this approach poses special problems in multiple theft offense cases because the comparison cannot be like to like—the amount taken in the first theft will always be smaller than the total, and the thefts will often not be identical crimes. Where the charges include multiple counts of first degree theft and multiple counts of second degree theft, examining only the first transaction versus the total of all the others leads to serendipitous results depending on the size of the first transaction. Under the "first act" approach, the thief who steals a large amount early in the scheme has an odd advantage.

The first act analysis is not the only means of satisfying *Batista*, and here it seems artificial without the balancing advantage of a more just result. The *Calvert* court simply examined the cumulative effects of stealing the money all at once, versus stealing it over time. This too is consistent with *Batista*.

In *Calvert*, the difference was trivial. Here, it was not. In 67 different transactions over 16 months, Kinneman stole over $200,000. The cumulative effects of this protracted scheme included the foreclosures of several of the properties for which he was acting as escrow agent. The thefts thus had significant cumulative consequences over time, and the evidence does not support the trial court's finding that the cumulative effect was "virtually nonexistent." Clerk's Papers at 404. I therefore agree that the exceptional sentence must be reversed.

Review denied at 152 Wn.2d 1022 (2004).